Jeffery MONTGOMERY, Appellant

v.

Steven PINCHAK; Al Ortiz; Terry Moore; C. Naficy, Mr.; C.M.S. Correctional Medical Service

No. 99–5081.

United States Court of Appeals, Third Circuit.

Argued: Sept. 28, 2001.

Filed: June 25, 2002.

Carl A. Solano (Argued), John F. Mullen, Schnader, Harrison, Segal & Lewis LLP, Philadelphia, PA, for Appellant.

James R. Birchmeier (Argued), Powell, Birchmeier & Powell, Tuckahoe, NJ, for Appellees Terry Moore, Al Ortiz, and Steven Pinchak.

Stephen D. Holtzman (Argued), Lally, Holtzman, Gilligan & Quasti, Linwood, NJ, for Appellees C.M.S. Correctional Medical Service and C. Naficy.

Before: ROTH, AMBRO, and FUENTES, Circuit Judges.

## OPINION OF THE COURT

FUENTES, Circuit Judge.

Jeffery Montgomery appeals from the entry of summary judgment against him in this civil rights action initially brought *pro se* under 42 U.S.C. § 1983. Montgomery, an inmate in the New Jersey State correctional system, claims that the defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. Montgomery also contests the District Court's denial of his motion to appoint counsel. We find that, under the standards established by this Court in *Tabron v. Grace*, 6 F.3d 147 (3d Cir.1993), the District Court abused its discretion in denying Montgomery counsel. Because we believe that Montgomery's ability to meet the evidentiary requirements of the summary judgment motion was prejudiced by his lack of counsel, we will vacate the District Court's grant of summary judgment and remand the case for further proceedings.

### I.

#### A. *Factual Background*

Plaintiff Jeffery Montgomery is currently an inmate at Riverfront State Prison in Camden, New Jersey. The events that gave rise to this lawsuit occurred from 1995 to 1998, while Montgomery was incarcerated at East Jersey State Prison ("East Jersey") in Rahway, New Jersey. Defendants Steven Pinchak, Terry Moore, and Al Ortiz were administrative officials at East Jersey during the period of Montgomery's incarceration (these three defendants will be collectively referred to as "Administrators"). Defendant Correctional Medical Services ("CMS") is a private corporate entity that has provided medical care to prisoners at East Jersey since April 1996. Defendant Dr. C. Naficy is a physician employed by CMS as an independent contractor at East Jersey who rendered medical care to Montgomery during his incarceration.

Montgomery has a heart condition and has tested positive for the human immuno-deficiency virus (HIV), which can cause AIDS. In March 1996, in response to Montgomery's complaints of chest pains, Dr. Ghazanfar Jafferi, a cardiologist at St. Francis Hospital, examined Montgomery and determined that he needed a cardiac catheterization. At that time, all medical care at East Jersey was provided by medical personnel employed by the New Jersey State Department of Corrections ("DOC") and all of Montgomery's medical records were within the custody and control of DOC. East Jersey was notified of Dr. Jafferi's recommendation, and Montgomery's catheterization was scheduled to be performed that May.

In April 1996, about a month after Dr. Jafferi's examination, the State of New Jersey entered into a contract with CMS, under which CMS assumed responsibility for providing medical care for the prisoners at East Jersey and all other New Jersey State correctional institutions. CMS was subsequently unable to locate any of Montgomery's previously generated medical records. These records included not only Dr. Jafferi's recommendation for Montgomery's catheterization, but also all records of any antibiotic medicines prescribed and/or dispensed to treat Montgomery's HIV as well as several medications prescribed for his heart condition.

Montgomery's scheduled catheterization was not performed that May. He claims that he never underwent the procedure, nor the subsequently prescribed treatment, because the defendants lost his medical records, which documented the necessity of the procedure. Montgomery raised this issue with defendant Pinchak through a letter dated August 9, 1996, stating:

I wish to bring to your attention about medical staff claiming to have lost my medical records. This has denied me to medical treatment follow up that was schedule for the month of May 1996 with a cardiologist specialist at St. Francis Hospital.

App. at A48.

On January 30, 1997, while in solitary confinement, Montgomery was awakened in the middle of the night by severe chest pains. A nurse came to his cell, accompanied by four East Jersey guards. Montgomery related to the nurse his cardiac history and condition, but, as Montgomery explained in his original complaint, "the nurse refuse[d] to have the officers open my cell door to examine me [n]or did the nurse take my vital signs which is standard procedure with an individual suffering from chest pains." App. at A43. The guards permitted Montgomery to attempt to pass his arm through the food portal so as to enable the nurse to take his vital signs. Finding, however, that Montgomery's arm would not fit, the nurse and guards made no further effort to treat Montgomery. In her report of the incident, the nurse explained simply that Montgomery was denied care that night because he seemed "agitated."

Montgomery also claims that, after losing his records, the defendants deprived him of necessary HIV antiviral medications over a ten month period, from May 1996 to February 1997.[1] A physical examination of Montgomery revealed that, by February 1997, his white blood cell count had dropped to a dangerously low level.

After CMS lost his medical records, Montgomery filed various requests, in accordance with East Jersey procedures, for both his records and for his prescribed treatment. Although a significant part of Montgomery's records were recreated, many remain missing by CMS' own admission. Additionally, Montgomery asserts that the defendants refused to recreate his file until after he brought this suit and that significant portions of the recreated records are either inaccurate or have been falsified. He also claims that the recreated records fail to reflect the actual treatment that he had received.

## B. *Procedural History*

In February 1997, Montgomery filed the initial complaint in the United States District Court for the District of New Jersey. Montgomery claimed that the defendants had violated his civil rights under 42 U.S.C § 1983 by depriving him of prescribed treatment for his various medical conditions, thereby denying him his Eighth Amendment right to be free from cruel and unusual punishment. Specifically, Montgomery alleged that, because of the lost medical records, the defendants denied him a cardiac catheterization scheduled for May 1996, and that from May 1996 to February 1997 they refused to administer his prescribed antiviral and cardiac medications, or to provide necessary x-rays and laboratory blood work. This is the only complaint that Montgomery has brought since being incarcerated.

In May 1997, the District Court approved Montgomery's application to proceed *in forma pauperis* and allowed him to submit an amended complaint. In June 1997, Montgomery submitted a motion for the appointment of counsel, asserting that the "complexity and difficulty of this case itself warrants counsel." App. at A40.

---

1. Montgomery alleges that the defendants were well aware of his HIV-positive status because Dr. Naficy had himself surgically removed two lumps from Montgomery that he explained were consistent with HIV symptoms. Indeed, the pharmacy records that the defendants submitted include prescriptions for HIV antiviral medicine for Montgomery.

Montgomery noted that the case "will require expert witnesses in the medical field," that he is "unable to afford counsel" and that he "has a limited knowledge of the law." *Id.*

The District Court referred the motion for appointment of counsel to the Magistrate Judge, who, on October 24, 1997, denied the motion. In explaining his decision, the Magistrate Judge remarked that "[p]laintiff's case does not seem to have merit as a civil rights suit." App. at A10–11. The Magistrate Judge added that, even if Montgomery had stated a proper civil rights claim, "[p]laintiff is well able to present his case. Although Plaintiff is incarcerated, he is adept at following the Court's procedures." App. at A11. Finding that the case "is fairly straightforward and presents no excessively complex issues of fact or law," the Judge concluded that Montgomery "can adequately represent himself" and that the appointment of counsel was therefore not merited. App. at A11.

On October 24, 1997, the same day he denied Montgomery's motion for appointment of counsel, the Magistrate Judge also denied Montgomery's Rule 37 motion to compel production of his medical documents from CMS.[2] Contrary to his finding

that Montgomery was "adept at following the Court's procedures," the Magistrate Judge determined that Montgomery had "failed to request the specified documents as provided for in Fed.R.Civ.P. 34," and that Montgomery further violated Local Civil Rule 37.1(b)(1) by not submitting affidavits certifying the parties' good faith efforts to resolve the discovery dispute without the aid of the court.[3] App. at A105. The Judge therefore concluded that Montgomery's "motion to compel production of documents [was technically] a request to Defendants to provide said documents" and should be denied. App. at A106.

Thereafter, Montgomery continued to pursue discovery without the aid of counsel, with varying degrees of success.[4] For instance, on November 20, 1997, Montgomery sent a series of interrogatories to defendants. CMS objected to six of Montgomery's first nine interrogatories. Montgomery then brought a motion to compel answers to those first six questions, pursuant to Federal Rule of Civil Procedure 37(a)(2)(B).[5] On January 27, 1998, the Magistrate Judge denied Montgomery's motion because CMS had in fact filed responses, even though they were in the form of objections.

---

**2.** Federal Rule of Civil Procedure 37(a) states, in relevant part, that "[a] party, upon reasonable notice to other parties and all persons affected thereby, may apply for an order compelling disclosure or discovery."

**3.** While it is true that Montgomery had not fulfilled the technical requirements of Local Civil Rule 37(1)(b)(1), he had at least submitted his own affidavit to the District Court, detailing his correspondence with, and unsatisfactory reply from, CMS' medical records supervisor. Additionally, while Montgomery's Rule 34 motion did not identify the specific medical records that he was requesting the court to compel CMS to produce, those documents were clearly identified in Montgomery's original request to CMS.

**4.** Because he was incarcerated and proceeding *pro se,* Montgomery was unable to take deposition testimony from any defendant.

**5.** Federal Rule of Civil Procedure 37(a)(2)(B) states, in relevant part, that "[i]f … a party fails to answer an interrogatory submitted under Rule 33 … the discovering party may move for an order compelling an answer…. The motion must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make the discovery in an effort to secure the information or material without court action."

In January 1998, Montgomery mailed an additional set of interrogatories to the defendants. A month later, Montgomery again filed a motion to compel answers pursuant to Rule 37(a)(2)(B). On April 28, 1998, the Magistrate Judge denied the motion, finding that "Plaintiff failed to abide by the [Federal] Rules [of Civil Procedure] in that he failed to obtain leave of court before serving his additional interrogatories."[6] App. at A159. The Judge additionally found that "Plaintiff failed to abide by L.Civ.R.37.1(b)(2) in that no copies of the additional interrogatories, which are the subject matter of this motion, were annexed or included with the moving papers."[7] *Id.*

On March 23, 1998, the Magistrate Judge ordered, in response to Montgomery's request pursuant to 28 U.S.C. § 1915(d), that several subpoenas compelling production of Montgomery's medical records be served upon medical service providers and prison authorities who had treated Montgomery.[8] Additionally, since CMS still claimed to be unable to find Montgomery's original records, on June 8, 1998, the court ordered CMS to file, within twenty days, a certification describing the efforts it had undertaken to find those records.

In June 1998, Montgomery attempted once again to serve interrogatories upon defendants. This time, Montgomery filed a motion for leave to serve additional interrogatories, which the Court granted on June 17, 1998.

On July 20, 1998, as CMS had failed either to answer Montgomery's interrogatories or to file a certification of its search efforts, Montgomery filed a motion for sanctions pursuant to Federal Rule of Civil Procedure 37(b). In opposition, CMS submitted a response to the interrogatories and an affidavit regarding the results of the search, and informed the court that some documents had been found. Based on CMS' submissions, the court denied Montgomery's motion for sanctions as moot.

During this period, Montgomery wrote a letter to the Magistrate Judge asserting that CMS was now, in response to his lawsuit, "retaliating mainly by denying the plaintiff ... prescribed ... medication." App. at A180. Montgomery stated that "the defendants correctional medical services, [have] intentionally refused to follow up needed prescribed medication that is clearly documented before them[and which was] prescribed by a cardiologist specialist." *Id.* Montgomery indicated that his prescription had expired on June 3, 1998, and that since then CMS had refused to reorder the medication. The record in this case does not reveal at what point CMS reinstated Montgomery's cardiac medication regimen.

Following discovery, the defendants moved for summary judgment and Montgomery filed a cross-motion. On January 28, 1999, the District Court granted sum-

---

**6.** Specifically, the Magistrate Judge was referring to Federal Rule of Civil Procedure 33(a). It states, in relevant part, that "[w]ithout leave of court or written stipulation, any party may serve upon any other party written interrogatories, not exceeding 25 in number.... Leave to serve additional interrogatories shall be granted to the extent consistent with the principles of Rule 26(b)(2) [requiring permission of the Court prior to serving additional interrogatories]."

**7.** This latter finding was, in fact, in error, as our review of the record demonstrates that Montgomery filed a copy of the additional interrogatories with the motion.

**8.** 28 U.S.C. § 1915(d) states, in relevant part, that "[t]he officers of the court shall issue and serve all process, and perform all duties in [indigent prisoner's civil litigation]."

mary judgment as to all of the Defendants. The court reasoned that Montgomery had failed to demonstrate that either Dr. Naficy or the prison administrators had acted with deliberate indifference to Montgomery's serious medical needs. The District Court further found that no cause of action could lie against defendant CMS, since *respondeat superior* is not a valid basis for a cause of action under 42 U.S.C. § 1983, and since "CMS is not alleged to have had anything to do with plaintiff's medical care." App. at A6. Based on these findings, the District Court denied Montgomery's cross-motion for summary judgment. Montgomery then filed a timely appeal with this Court.

## II.

Montgomery raises two issues on appeal. First, he claims that the District Court abused its discretion in denying his motion to appoint counsel, and in not appointing counsel *sua sponte* later in the proceedings, when Montgomery's difficulties with the rules of discovery became apparent. Montgomery also claims that the District Court erred in finding that Montgomery's case presented no genuine issues of material fact, and, therefore, in granting the defendants' summary judgment motion. Because we agree with Montgomery that the District Court abused its discretion in failing to appoint counsel, we will vacate the District Court's judgment and remand the case with instructions to appoint counsel to assist Montgomery in the preparation and presentation of his case.

We review a district court's decision to deny counsel to an indigent civil litigant for abuse of discretion. *Hamilton v. Leavy*, 117 F.3d 742 (3d Cir.1997). We have determined that a district court abuses its discretion if its decision "rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *Newton v. Merrill Lynch*, 259 F.3d 154, 165–66 (2001) (quoting *In re Gen. Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 783 (3d Cir.1995)). We have jurisdiction over the District Court's final order under 28 U.S.C. § 1291.

## III.

Indigent civil litigants possess neither a constitutional nor a statutory right to appointed counsel. *See Parham v. Johnson*, 126 F.3d 454, 456–57 (3d Cir. 1997). Nevertheless, Congress has granted district courts statutory authority to "request" appointed counsel for indigent civil litigants. *See* 28 U.S.C. § 1915(e)(1) (providing that "[t]he court may request an attorney to represent any person unable to afford counsel"). This Court has interpreted § 1915 as affording district courts "broad discretion" to determine whether appointment of counsel in a civil case would be appropriate. *See Tabron v. Grace*, 6 F.3d 147, 153 (3d Cir.1993). The *Tabron* court found that the decision to appoint counsel may be made at any point in the litigation, and may be made by a district court *sua sponte. Id.* at 156.

In *Tabron*, we developed a list of criteria to aid the district courts in weighing the appointment of counsel for indigent civil litigants.[9] As a threshold matter, a dis-

9. This court has rejected the rule of our sister circuits that have held that appointment of counsel under § 1915(e)(1) is justified only under "exceptional circumstances." *See, e.g., Lavado v. Keohane*, 992 F.2d 601, 605–06 (6th Cir.1993) ("Appointment of counsel in a civil case ... is a privilege that is justified only by exceptional circumstances."); *Aldabe v. Aldabe*, 616 F.2d 1089, 1093 (9th Cir.1980) ("[T]his court has limited the exercise of [the District Court's discretionary power under the statute] to exceptional circumstances.").

trict court must assess whether the claimant's case has some arguable merit in fact and law. *Tabron,* 6 F.3d at 155; *see also Parham,* 126 F.3d at 457. If a claimant overcomes this threshold hurdle, we identified a number of factors that a court should consider when assessing a claimant's request for counsel. These include:

1. the plaintiff's ability to present his or her own case;
2. the difficulty of the particular legal issues;
3. the degree to which factual investigation will be necessary and the ability of the plaintiff to pursue investigation;
4. the plaintiff's capacity to retain counsel on his or her own behalf;
5. the extent to which a case is likely to turn on credibility determinations, and;
6. whether the case will require testimony from expert witnesses.

*Tabron,* 6 F.3d at 155–57.

We have noted that "this list of factors is not exhaustive, but should serve as a guidepost for the district courts." *Parham,* 126 F.3d at 457 (citing *Tabron,* 6 F.3d at 155). In addition, we have cautioned that courts should exercise care in appointing counsel because volunteer lawyer time is a precious commodity and should not be wasted on frivolous cases. *Id.* at 458.

■ As a threshold matter, we must assess whether Montgomery's case, in which he claims that the defendants violated his civil rights under 42 U.S.C § 1983 by depriving him of prescribed medical treatment, has "some arguable merit in fact and law." *Parham,* 126 F.3d at 457

(citing *Tabron,* 6 F.3d at 155); *see also Hodge v. Police Officers,* 802 F.2d 58, 60 (2d Cir.1986) (explaining that "[i]f mere bald assertions by an indigent ... required appointment of an attorney under [the statute], the demand for such representation could be overwhelming"). Montgomery asserts that this denial of adequate medical treatment has forced him to endure pain and suffering, thereby violating his Eighth Amendment right to be free from cruel and unusual punishment.

■ To demonstrate a prima facie case of cruel and unusual punishment based on the denial of medical care, a plaintiff must establish that defendants acted "with deliberate indifference to his or her serious medical needs." *See Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Durmer v. O'Carroll,* 991 F.2d 64, 67 (3d Cir.1993). This standard has two elements: First, plaintiff must make an *"objective"* showing that the deprivation was "sufficiently serious," or that the result of defendant's denial was sufficiently serious. Additionally, the plaintiff must make a *"subjective"* showing that defendant acted with "a sufficiently culpable state of mind." *See Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

In assessing whether Montgomery's claim had "some merit in fact and law," the Magistrate Judge made just one finding. He found that Montgomery did not allege the requisite "deliberate indifference" in claiming that his federal civil rights were violated. *See Montgomery v. Pinchak,* Civ. No. 97–2401 at 3 (D.N.J., Oct. 24, 1997). The Magistrate Judge held that "Plaintiff's complaint and other papers

We explained in *Tabron* that "[n]othing in [the] clear language" of the statute ("the court may request an attorney to represent any person unable to afford counsel"), "[nor] in the legislative history ... [,] suggests that appointment is permissible only in some limited set of circumstances." *Tabron,* 6 F.3d at 155.

filed in this action fail[ed] to allege the necessary intentional indifference on behalf of the Defendants needed to successfully prosecute a civil rights claim. [Therefore,] Plaintiff's case, as it pertains to the Eight Amendment, does not appear to have some potential merit in fact and law." *Id.* The Magistrate Judge clearly erred in this determination.

It is plain from the record that Montgomery did, in fact, "allege the necessary intentional indifference on behalf of the Defendants." Montgomery's amended complaint, filed well before the Magistrate Judge's ruling on Montgomery's motion for appointment of counsel, conformed to the language of the caselaw by claiming that "Defendants have violated Plaintiff's rights ... *with deliberate indifference* and contempt of the U.S. District Court and the District of New Jersey." App. at A91. While Montgomery's pleading may be inartful, it satisfies the more lenient standard that district courts are required to apply to *pro se* submissions. *See, e.g. Estelle*, 429 U.S. at 106, 97 S.Ct. 285 ("A pro se complaint, 'however inartfully pleaded' must be held to 'less stringent standards than formal pleadings drafted by lawyers.' ") (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In light of this evidence, the Magistrate Judge's determination misstates the record and is plainly in error.

Neither party disputes that Montgomery has been diagnosed with, and prescribed medicine for, his heart and HIV conditions. At oral argument, Montgomery's attorney asserted that, because both conditions can be life threatening if not properly treated, Montgomery has demonstrated the objective component of the *Estelle* standard. We agree and find that Montgomery has satisfied the first prong of *Estelle* by demonstrating a serious medical need. *See Monmouth County Correc-*

*tional Institutional Inmates v. Lanzaro,* 834 F.2d 326, 347 (3d Cir.1987) (instructing that the seriousness of a medical need "may ... be determined by reference to the effect of denying the particular treatment").

■ In analyzing Montgomery's chances for success on the merits, we agree with the District Court's determination on summary judgment that the mere loss by the defendants of Montgomery's medical records does not rise to the requisite level of deliberate indifference. *See Lanzaro*, 834 F.2d at 346 (instructing that "mere allegations of medical malpractice [do not] raise issues of constitutional import"). Moreover, if Montgomery's claim had merely concerned the prison's negligent misplacement of his medical records, we might also agree with the Magistrate Judge's earlier determination that Montgomery's case lacked merit in fact and law, and does not therefore require the appointment of counsel. *See, e.g., Hodge*, 802 F.2d at 60 (finding that, as a threshold matter, "counsel is ... unwarranted where the indigent's chances of success [on the merits] are extremely slim").

■ However, Montgomery claims more than the mere loss of his records. For instance, Montgomery asserts that, over a nine-month period from May 1996 to February 1997, the defendants refused to provide him with the antiviral medications, x-rays, laboratory blood work, and prescription medication refills that their own medical staff, prior to the disappearance of Montgomery's records, had determined were necessary for treating his heart and HIV conditions. According to Montgomery, this occurred despite his numerous documented requests for treatment and medical care. Additionally, he claims that the defendants refused to recreate his file until after he brought this suit, and that significant portions of the

recreated records are either inaccurate or have been falsified. Finally, Montgomery has alleged that the prison staff, in retaliation for his having filed this suit, once again refused to refill Montgomery's prescription for his prescribed cardiac medication, beginning in July of 1998. In addition, defendants' own records indicate that they were aware that a cardiac catheterization had been scheduled for Montgomery, but ten months after the date set had still not been performed. *See* App. at A288 (memo of March 10, 1997, from CMS Quality Assurance Specialist to the Registered Nurse in charge of the prison ward). Montgomery's assertions and the defendants' admission are considerable factors in establishing a *prima facie* case of the defendants' deliberate indifference, and, consequently, we find that Montgomery has adequately demonstrated the subjective component of the *Estelle* standard. *See Durmer v. O'Carroll, M.D.*, 991 F.2d 64, 68 (3d Cir.1993) (noting that deliberate indifference may exist in a variety of different circumstances, including where "prison authorities prevent an inmate from receiving recommended treatment," or "where knowledge of the need for medical care[is accompanied by the] intentional refusal to provide that care").

We therefore conclude that Montgomery's allegations clearly state a non-frivolous, *prima facie* case of deliberate indifference to a serious medical need and that the already established evidence indicates more than an "extremely slim" chance of success on the merits. Therefore, we find that Montgomery's case demonstrates potential merit in fact and law, and that he has met his threshold burden for appointment of counsel. Of course, our inquiry does not end here. We must now analyze Montgomery's claim under each of the *Tabron* post-threshold factors.

## IV.

### A. *Plaintiff's Ability to Present His or Her own Case*

Perhaps the most significant of *Tabron*'s post-threshold factors is the plaintiff's ability to present his or her case. *See Tabron*, 6 F.3d at 156 (describing this component of the post-threshold analysis as "a significant factor"). We have identified a number of factors that courts should consider in determining a plaintiff's ability to present her own case. These include "the plaintiff's education, literacy, prior work experience, and prior litigation experience," along with "a plaintiff's ability to understand English . . . [and] the restraints placed upon [a prisoner plaintiff] by confinement." *Id.*; *see also Parham*, 126 F.3d at 459 (instructing that while these factors are "not always determinative," they "should be considered in each meritorious case").

In arguing that the appointment of counsel was not appropriate because Montgomery was fully capable of presenting his own case, defendants accurately point out that Montgomery was able to "respond to all pending motions and sought the Court's relief" on his own behalf by filing his own motions. Furthermore, the Magistrate Judge similarly found that "although . . . incarcerated, [Montgomery] is adept at following the Court's procedures," and that all of his submissions had been "both coherent and comprehensive." *See Montgomery*, Civ. No. 97–2401, at 5.

Under similar circumstances, this Court has determined that the ability to file and respond to motions does indicate that a plaintiff has some legal knowledge and is literate. But "this fact alone does not conclusively establish that [a Plaintiff] was able to present his own case." *See Parham*, 126 F.3d at 459. In *Parham*, we found that a "prisoner's lack of legal experience and the complex discovery rules

clearly put him at a disadvantage in countering the defendant's discovery tactics [and that] ... these [discovery] rules prevented [the Plaintiff] from presenting an effective case below." *Id.*

As previously noted, Montgomery was not a sophisticated "jailhouse lawyer." This was the first and only claim that he had brought since being incarcerated. We also know that, because of his confinement, he was unable to depose any defendants. Montgomery nonetheless attempted to proceed with an investigation through interrogatories, document requests, and requests for admissions. As did the plaintiff in *Parham,* he encountered multiple obstacles, both in the resistance of the defendants and in the intricacies of the discovery rules.

Montgomery's unfamiliarity with complex discovery rules forced numerous technical rulings that hindered his attempts to investigate the facts underlying his case. It is difficult for this Court to reconcile those rulings with the District Court's concurrent finding that Montgomery was "adept at following the Court's procedures," and could therefore litigate his own claim. *See Montgomery,* Civ. No. 97–2401, at 5. Furthermore, while we are obligated to afford the District Court's findings considerable discretion, we simply cannot agree that, as demonstrated by Montgomery's filings in the record, he possesses the type of "education, literacy, prior work experience, and prior litigation experience" necessary to represent himself competently in this civil suit. Since we have determined that his case has some potential merit, and since this case involves complex discovery rules with which Montgomery was seemingly unable to comply, we find that Montgomery's ability to present his own case is doubtful, and that this factor weighs in favor of appointing counsel. *See Parham,* 126 F.3d at 454.

## B. *The Complexity of the Legal Issues Involved*

■ This Court has also instructed that the complexity of the particular legal issue involved must be considered in assessing an indigent civil litigant's application for counsel. *See Tabron,* 6 F.3d at 156 (explaining that "where the law is not clear, it will often best serve the ends of justice to have both sides of a difficult legal issue presented by those trained in legal analysis"). As the Defendants argue, however, the law regarding Eighth Amendment deliberate indifference is clear, and the standard of proof is well known, as is demonstrated by the fact that Montgomery "referenced [it] in his Amended complaint and numerous court filings." App. Br. for CMS and Dr. Naficy at 20. Indeed, the Magistrate Judge found that "[t]his case ... is fairly straightforward and presents no excessively complex issue of fact or law" *Montgomery,* Civ. No. 97–2401, at 4.

Nevertheless, this Court has already held that a § 1983 civil rights case alleging deliberate indifference to a prisoner's serious medical needs can raise sufficiently complex legal issues to require appointment of counsel. *See Parham,* 126 F.3d at 459. This is because even where "the ultimate [legal] issue appears relatively simple ... [s]implicity in the allegation supporting the claim does not translate into simplicity in the presentation of the claim." *Id.* (instructing that, in analyzing the complexity of the legal issues for purposes of appointing counsel, "courts must still look to the proof going towards the ultimate issue and the discovery issues involved"); *see also Tabron,* 6 F.3d at 157 (instructing that the difficulty of the legal issues must be considered "in conjunction with ... the plaintiff's capacity to present his own case").

In asserting that Montgomery's claim presented no complex legal issues, neither the defendants nor the Magistrate Judge has attempted to explain how Montgomery's claim differs from that presented in *Parham*. *Parham* involved the same legal proof criteria, and indeed, the *Parham* court recognized several factors also implicated in Montgomery's case. As described above, the difficulty Montgomery experienced in complying with requirements for formulating discovery requests hindered the presentation of his claim. In *Parham*, we specifically noted that "courts should be aware that it may be difficult for indigent plaintiffs to understand the complex discovery rules." *Parham*, 126 F.3d at 460. The numerous technical rulings against Montgomery clearly indicated that Montgomery was experiencing significant difficulty in proving the elements of his legal claim. Montgomery must also contend with the same lack of representation at his own deposition, as well as the lack of opportunity to take oral depositions, that this Court found compromised Parham's case. Therefore, we conclude that Montgomery's case presented complex legal issues, and this factor weighs in favor of appointing counsel.

C. *The Degree to Which Factual Investigation Will Be Necessary and the Ability of the Plaintiff to Pursue Such*

■ As with any prisoner, the circumstances of Montgomery's confinement limited his ability to conduct discovery in support of his claim. We have noted that, in weighing a request from an indigent civil litigant for appointment of counsel, courts should consider a prisoner's inability to gather facts relevant to the proof of his claim. *See Tabron*, 6 F.3d at 156 ("[T]he court may ... consider the extent to which prisoners and others suffering confinement may face problems in pursuing their claim [such as] where the claims are likely to require extensive discovery and compliance with complex discovery rules."); *see also Rayes v. Johnson*, 969 F.2d 700, 703 (8th Cir.1992) (finding that conditions of indigent prisoner's confinement severely disadvantaged him in discovery and reversing district court's denial of request for appointment of counsel in part because of prisoner's confinement). Courts should further consider that "it may be difficult for indigent plaintiffs to understand the complex discovery rules" in investigating their claims. *Parham*, 126 F.3d at 460.

This is not to say that counsel should be appointed in every potentially meritorious claim by an indigent prisoner where some investigation may be required. Nevertheless, the particular circumstances of Montgomery's case demonstrate a clear need for factual investigation beyond that which Montgomery could conduct from his prison cell. For example, the crux of Montgomery's dispute concerns missing documents, and the ramifications of the Defendants' failure to replace them. The absence of these key records prevents Montgomery from building a sufficient case solely through document requests. Through depositions, an attorney could attempt to recreate the aspects of the story that were lost with the disappearance of Montgomery's medical records.

Furthermore, Montgomery encountered significant resistance from the Defendants in responding to his *pro se* discovery motions. For instance, there is no indication in the record that any of the defendants other than CMS ever responded to Montgomery's interrogatories. It is not overstatement to characterize the Defendants' actions in the discovery process as less than forthcoming, and Montgomery's success at investigating his claim only diminished as he proceeded. Either the Magistrate Judge or the District Court should

have recognized Montgomery's difficulties as they became increasingly apparent and, in light of them, reconsidered Montgomery's motion for appointment of counsel. We have previously observed that trial courts possess such authority:

> [W]e emphasize that appointment of counsel under § 1915(d) may be made at any point in the litigation and may be made by the district court *sua sponte.* Accordingly, even if it does not appear until trial (or immediately before trial) that an indigent litigant is not capable of trying his or her case, the district court should consider appointment of counsel at that point.

*Tabron*, 6 F.3d at 156–57 (citation omitted).

The absence of medical records that were vital to Montgomery's claim, the defendants' resistance to Montgomery's requests during discovery, and Montgomery's increasingly apparent inability to navigate his case's complex discovery rules all strongly suggest that Montgomery was unable to properly pursue a factual investigation and this factor thus weighs in favor of the appointment of counsel.

### D. *The Need for Expert Medical Testimony*

■ This Court has recognized the need for expert testimony in proving a claim based on medical injury. *See Parham*, 126 F.3d at 460 ("A medical malpractice case involves complex facts and medical records that even most lawyers struggle to comprehend. Hence, most of these cases require expert testimony."). Montgomery presents a case that would especially benefit from expert testimony because he lacks the medical records that he might otherwise use to demonstrate his alleged injury to a jury. *See Boring v. Kozakiewicz*, 833 F.2d 468, 473–74 (3d Cir. 1987) (holding that, in a prisoner's Eighth

Amendment claim of deliberate indifference to a serious medical need, expert testimony is necessary when the seriousness of injury or illness would not be apparent to a lay person). It is clear that Montgomery himself cannot explain the medical consequences of neglecting to conduct a scheduled cardiac catheterization for a patient with heart disease. Nor can Montgomery describe the effects upon the body of being denied, for prolonged periods, prescribed heart and HIV medication. Heart disease and HIV, unlike, for example, broken legs or bullet wounds, do not clearly manifest themselves in ways that are obvious and ascertainable to a lay person. *See id.* at 473. Therefore, we find that to prove any serious deterioration in his heart's condition or in his immune system, Montgomery would need the testimony of a medical expert.

The District Court acknowledged as much when it dismissed Montgomery's claim at the summary judgment stage, because it noted that Montgomery "offered no medical testimony that would indicate ... that a diminished standard of care ... caused deterioration in [Montgomery's] condition." App. at A5. Nevertheless, the Magistrate Judge had previously determined, in rejecting Montgomery's earlier request for appointed counsel, that "it is unlikely that the evidence will consist in large part of expert testimony so as to require skill in the presentation of evidence and in cross-examination." *Montgomery*, Civ. No. 97–2401, at 4.

The successive contradictory decisions of the Magistrate Judge and the District Court bound Montgomery in a paradox. The Magistrate Judge, determining that medical expert testimony would be unnecessary, found no need to appoint counsel. The District Court, finding medical testimony essential to Montgomery's proof of

injury, used its absence to grant summary judgment against him.

Together, these decisions significantly hindered, if not rendered futile, Montgomery's efforts to present his claim. *See Parham,* 126 F.3d at 460 (finding nearly identical contradictory rulings "troublesome," particularly considering that the court "could use the lack of expert testimony as a shield to protect its denial of a motion for counsel and then as a sword to slay the indigent plaintiff's case").

Therefore, we conclude that the Magistrate Judge clearly erred in his determination that medical expert testimony would be unnecessary in Montgomery's case. While this Court has previously recognized that "it still may be difficult for appointed counsel to obtain and afford an expert," we continue to believe that "appointed counsel will have a much better opportunity to obtain an expert than would an indigent prisoner." *Id.* Consequently, we find that this factor weighs heavily in favor of the appointment of counsel.

### E. *The Plaintiff's Capacity to Retain Counsel on his or her Own Behalf*

There is no evidence in the record that Montgomery can afford to retain counsel on his own behalf. On May 19, 1997, the District Court approved Montgomery's application to proceed *in forma pauperis* and there is nothing in the record to indicate any change in Montgomery's financial situation. Montgomery has remained in pris-on since that time. Montgomery's inability to retain counsel is therefore another factor suggesting that the appointment of counsel is warranted in this instance.

### F. *Credibility Determinations*

We have instructed that when considering the role of credibility determinations as a factor, "courts should determine whether the case [will be] solely a swearing contest." *Id.* Neither the evidence in the record nor in the District Court's opinion gives any such indication. Therefore, this is the only factor of those that we have considered that does not encourage the appointment of counsel.

### V.

The circumstances of this case implicate five of the six *Tabron* factors that weigh in favor of appointment of counsel. This Court has instructed that "where a plaintiff's case appears to have merit and most of the aforementioned [*Tabron*] factors have been met, courts should make every attempt to obtain counsel." *Id.* at 461. Given our analysis of the *Tabron* factors and our assessment of the District Court's clear errors in applying those factors, we conclude that the District Court abused its discretion in refusing to appoint counsel for Montgomery, either upon Montgomery's initial motion prior to discovery, or later in the proceedings when it became apparent that the appointment of counsel would be particularly appropriate in this instance.[10]

---

**10.** We continue to recognize that the pool of qualified attorneys willing to accept such assignments on a *pro bono* basis is a finite commodity, and that district courts must therefore exercise their broad statutory discretion discerningly. *See Tabron,* 6 F.3d at 156 (noting the "significant practical restraints on the district courts' ability to appoint counsel," including "the ever-growing number of prisoner civil rights actions filed each year in the federal courts; the lack of funding to pay appointed counsel; and the limited supply of competent lawyers who are willing to undertake such representation without compensation"). However, prudent observance of the *Tabron* factors should allow for the appropriate allocation of limited legal resources to those genuinely meritorious indigent civil cases that require and deserve *pro bono* legal counsel.

Montgomery's ability to meet the evidentiary requirements of the defendants' summary judgment motion was prejudiced by the District Court's refusal to appoint counsel. Under these circumstances, we will vacate the District Court's grant of summary judgment and remand this case for further proceedings consistent with this opinion.