In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-2999

UVION JUNIOR,

*Plaintiff-Appellant,*

*v.*

SUMMER ANDERSON,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 C 813—**Marvin E. Aspen**, *Judge*.

ARGUED JUNE 6, 2013—DECIDED JULY 30, 2013

Before POSNER, ROVNER, and WOOD, *Circuit Judges*.

POSNER, *Circuit Judge*. The plaintiff, a pretrial detainee in a maximum-security tier of the Cook County Jail in Chicago, brought suit under 42 U.S.C. § 1983 against a guard (against others as well, but he doesn't challenge the district judge's dismissal of them), Anderson, who he claims failed to protect him from an attack by other inmates. The district judge granted summary judgment in favor of Anderson. The plaintiff challenges that

ruling and also the judge's anterior refusal to request assistance of counsel for the plaintiff.

Construed as favorably to the plaintiff as the record permits, the facts pertinent to his case are as follows:

The plaintiff's tier consisted of 19 double-occupancy cells, containing therefore a total of 38 prisoners. We don't know how many of them were pretrial detainees and how many were serving sentences, so we'll refer to all of them simply as prisoners. Apparently the cells were arrayed in two rows, one of 10 cells and one of 9, facing each other. The prisoners were allowed to spend some time each day out of their cells, in a dayroom that had a television set. But in order to minimize "detainee incidents," only the prisoners in one row of cells were allowed to be in the dayroom at the same time; the other prisoners remained locked in their cells until it was their turn to visit the dayroom. So instead of 38 prisoners milling about in the dayroom at the same time, at most 20 were permitted to be there.

On the day of the attack, defendant Anderson was the tier officer. She occupied a station, protected by bars, from which she could see the tier of cells with the corridor separating the two rows, and also the dayroom. (The record contains no diagram; that is one of many unfortunate omissions.) A control panel at her station indicated for each cell whether it was securely locked. Shortly after 3 p.m. (the beginning of her shift) she noticed that the control panel indicated that two of the occupied cells, one in each row, were not securely locked. She wrote "security risk" in her log but did nothing further, such as ask another guard to lock the cells.

At 6:30 that evening, Anderson released half the tier occupants for their scheduled time in the dayroom, the plaintiff among them. He testified at his deposition that he overheard some of the other prisoners in the dayroom ask Anderson to let the prisoners in the other half of the tier out of their cells so that they could go to the dayroom too. The district judge said that this testimony was inadmissible hearsay. It was not. The plaintiff was testifying to what he heard—the request that Anderson let out the other inmates—rather than to the truth of anything they said, such as that the prisoners in the other tier wanted to be released from their cells so that they could go to the dayroom out of turn. Testimony to what one heard, as distinct from testimony to the truth of what one heard, is not hearsay. *Dutton v. Evans*, 400 U.S. 74, 88 (1970); *Tunis v. Gonzales*, 447 F.3d 547, 551 (7th Cir. 2006).

Shortly afterward the plaintiff heard the sound of cell doors opening, but he saw none of the prisoners enabled by the opening of their cells to leave them enter the dayroom. Instead they congregated in the darkened corridor between the two rows of cells. The lights in the corridor had not been turned on, according to the plaintiff, and so the corridor was dark, and maybe the prisoners didn't want to be easily recognized.

Wanting to return to his cell to use the bathroom facilities in it, the plaintiff stepped into the corridor (it was now about 6:50 p.m.)—where he was forthwith attacked from behind by a number of prisoners, armed

with shanks, who stabbed him repeatedly. Most of his attackers seem to have followed him out of the dayroom, but two of them had come from cells in the row of cells that were supposed to be locked. One of them was from a cell that Anderson had noted was not securely locked.

The plaintiff broke free of his attackers and ran toward Anderson's station, shouting for help, but she was not there. He passed out. When he awoke, several guards were present. He was hospitalized for two days for treatment of his multiple stab wounds.

Anderson denies having left her station, yet oddly admits not having witnessed the attack—though she insists, contrary to the plaintiff, that the corridor lights were on. She denies having let anyone from the row of cells that were supposed to be locked out of his cell. But one of the attackers, Raymond Anderson—presumably not a relative of the defendant (though a lawyer, if the plaintiff had had one, would doubtless have wanted to explore the possibility that the two Andersons are related)—had come from one of the cells that were supposed to be locked but not a cell that defendant Anderson had noted on her log as not being securely locked. Another prisoner in the supposedly locked-down row declared that he, too, had been out of his cell and in the dayroom during the attack.

The district judge ruled that even if it was true that the defendant had "failed to protect [the plaintiff] by allowing some detainees out of their cells that shouldn't have been out; failed to make sure lights were working

and on in the corridor area; and [had left] her post for about 15-20 minutes," these facts would establish merely negligence, and not that Anderson had been "aware of a specific, impending, and substantial threat to [the plaintiff's] safety." And so the plaintiff had failed to make a prima facie case that Anderson had been deliberately indifferent to his safety.

The judge dismissed the suit prematurely. The purpose of limiting the number of prisoners allowed in the dayroom at one time is security—understandably so, given that they are all believed to be dangerous, as otherwise they wouldn't be in a maximum-security tier. The fact that one of the cells in the row of cells that were supposed to be locked was unlocked was recorded—twice—by Anderson herself as creating a "security risk." For her nevertheless to have let out of their cells several of the inmates who were supposed to remain locked up, and let them congregate in a darkened corridor, and then to leave her post, with the result that no guard was present to observe more than 20 (we don't know how many more than 20) maximum-security prisoners milling about, could give rise to an inference of conscious disregard of a significant risk of violence (the test established by *Farmer v. Brennan*, 511 U.S. 825 (1970)), as in the similar case of *Pavlick v. Mifflin*, 90 F.3d 205, 208-09 (7th Cir. 1996). It was fear of violence that had motivated the rule forbidding the prisoners in the two rows to mingle in the dayroom, and the likelihood of violence was further amplified by the sole guard's leaving her post, so that the prisoners knew that no one in authority was watching them—and

moreover leaving her post with the corridor lights out, so that the improperly released prisoners, armed with shanks, could congregate unobserved in the corridor.

We said that a jury could draw an inference of deliberate indifference from the facts that we've recited (if they are proved at trial), not that it would have to. The plaintiff has, however, raised a triable issue, and so the case must be remanded for a trial. And not just for a trial. The plaintiff argues compellingly that he needed a lawyer to help him develop his case. We must decide whether the judge erred in refusing to try to recruit a lawyer for him.

The plaintiff explained to the judge that he had little education and no knowledge of law or medicine, that he had tried without success to find a lawyer to represent him, and that now, incarcerated in a prison 300 miles from Chicago—a prison moreover that experienced frequent lockdowns while he was attempting to prepare his case—there was no way he could obtain Cook County jail records, depose witnesses (notably the defendant), or otherwise prepare the case. Maybe he could have conducted depositions from afar by video, but no evidence concerning the feasibility of that approach has been presented; nor has the defendant argued that it would be feasible.

The judge thought this a simple case, which the plaintiff despite his handicaps of distance and lack of skills and knowledge could readily handle without a lawyer's aid. The first link in this chain of thought was correct, but not the second. The case is not analytically

complex, but its sound resolution depends on evidence to which the plaintiff in his distant lockup has no access; and a plaintiff's inability to investigate crucial facts by virtue of his being a prisoner or of the remoteness of the prison from essential evidence is a familiar ground for regarding counsel as indispensable to the effective prosecution of the case. See *Navejar v. Iyiola*, No. 12-1182, 2013 WL 2321349, at *5 (7th Cir. May 29, 2013) (per curiam); *Santiago v. Walls*, 599 F.3d 749, 766 (7th Cir. 2010); *Montgomery v. Pinchak*, 294 F.3d 492, 501-04 (3d Cir. 2002); *Hendricks v. Coughlin*, 114 F.3d 390, 394-95 (2d Cir. 1997); *Rayes v. Johnson*, 969 F.2d 700, 703-04 (8th Cir. 1992); *Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984). We acknowledge that our decision in *Zarnes v. Rhodes*, 64 F.3d 285 (7th Cir. 1995), leans the other way. It affirmed the denial of appointment of counsel even though, just as in this case, the plaintiff was imprisoned (in California) far from where she'd been assaulted (Illinois). But the district judge had found that she'd been able to investigate the facts adequately despite the distance, and although we were skeptical we didn't think the judge had committed clear error that would justify our rejecting the finding. Moreover, the case had been dismissed on a Rule 12(b)(6) motion, and in reversing (in part) and remanding we suggested that with the case now about to move beyond the Rule 12(b)(6) stage the judge should give serious consideration to obtaining counsel for the prisoner. See *Montgomery v. Pinchak*, *supra*, 294 F.3d at 501-06; *Tabron v. Grace*, 6 F.3d 147, 156-57 (3d Cir. 1993).

The prisoner plaintiff in this case, denied assistance of counsel, needed to, but couldn't, depose the defendant

in order to explore the reason for her having left her post, why she recorded the fact that a cell supposed to be locked was not securely locked as a "security risk," and the apparent contradiction between her denial of leaving her post and her denial of witnessing an attack unfolding only a short distance in front of her. Also missing are a diagram indicating the position of the defendant's duty station in relation to, and its distance from, the site of the attack; jail records; and testimony of jail staff concerning the reasons for not allowing all the prisoners in the tier to use the dayroom at the same time.

Unanswered questions abound. Had there been a time when all the prisoners in the tier had been allowed to mingle in the dayroom? If so, had there been violence, which the rule permitting only half the prisoners to be in the dayroom at the same time had been adopted to prevent from recurring? How frequently under the current rule of separation (though flouted when the attack occurred) do prisoners from the two rows mingle in the dayroom, and with what consequences? Did the defendant know that just a few weeks earlier the plaintiff's cellmate had been assaulted and stabbed in the dayroom and that according to him prisoners from the supposedly locked-down side of the tier had been in the dayroom at the time? And how, by the way, are prisoners assigned to one row or the other? Randomly? Or is an attempt made to keep prisoners who are likely to get into fights with each other apart? Also useful would be the criminal records of the prisoners at the time of the attack—just

how dangerous were those prisoners? And finally there is the question whether the two Andersons are related— a question the plaintiff can't investigate on his own.

All these gaps cry out for evidence that a lawyer could obtain but the plaintiff could not. The judge should have realized this and tried to get him a lawyer. *Navejar v. Iyiola, supra*, 2013 WL 2321349, at *5; *Santiago v. Walls, supra*, 599 F.3d at 762-65; *Pruitt v. Mote*, 503 F.3d 647, 660 (7th Cir. 2007) (en banc); *Montgomery v. Pinchak, supra*, 294 F.3d at 503; *Hendricks v. Coughlin, supra*, 114 F.3d at 394-95.

Maybe the evidence that a lawyer would unearth would support the defendant rather than the plaintiff. But that can't be assumed at this stage. Because there's no basis for assuming that the plaintiff's case lacks merit, the grant of summary judgment in favor of the defendant must be reversed and the district court directed to try to recruit counsel for the plaintiff. 28 U.S.C. § 1915(e)(1). That won't be hard to do if the lawyer who represented the plaintiff in this appeal is able and willing to handle the case on remand. Finally, Circuit Rule 36 shall apply.

REVERSED AND REMANDED.