**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 20, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

KATHY CONTRERAS, on behalf of
her minor child A.L.,

Plaintiff - Appellant,

v.

DOÑA ANA COUNTY BOARD OF
COUNTY COMMISSIONERS, doing
business as DOÑA ANA COUNTY
DETENTION CENTER; PACO
LUNA; JAIME CASADO; and
SHAYLENE PLATERO,

Defendants - Appellees.

No. 18-2176

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. NO. 2:18-CV-00156-GBW-GJF)**

---

Katherine Wray (Margaret Strickland, McGraw & Strickland, Las Cruces, New
Mexico, with her on the briefs) Wray & Girard, PC, Albuquerque, New Mexico,
for Appellant.

Damian L. Martinez (Haley R. Grant with him on the brief), Holt Mynatt Martinez
P.C., Las Cruces, New Mexico, for Appellees.

---

Before **TYMKOVICH**, Chief Judge, **BALDOCK**, and **CARSON**, Circuit Judges.

---

**PER CURIAM**

This appeal arises from allegations of deliberate indifference to violence among pretrial detainees at a juvenile detention facility in Doña Ana County, New Mexico. After A.L. was booked into the Doña Ana County Detention Center, three other detainees threatened him with physical harm. Corrections officers responded by imposing a highly-restrictive lockdown regime on all three aggressors. Despite these countermeasures, one of the aggressors—while temporarily permitted outside of his cell—accessed the touchscreen control panel that regulated access to cells within the juvenile pod. While corrections officers were distracted, he opened several cells simultaneously. The other two aggressors took this opportunity to physically assault A.L.

Kathy Contreras, A.L.'s mother, subsequently brought this lawsuit against the three corrections officers present during the attack, as well as the Doña Ana County Detention Center. She alleges the defendants violated A.L.'s Fourteenth Amendment right to substantive due process through deliberate indifference to the violence threatened by other detainees. The district court granted the defendants' motion for summary judgment on the basis of qualified immunity. On appeal, a majority of the court concludes the district court did not err. No legal authorities clearly establish a constitutional violation under these circumstances.

We accordingly affirm the judgment of the district court.[1]  Chief Judge

Tymkovich concurs, concluding that no constitutional violation occurred.  Judge

Carson concurs, concluding that he would dispose of this case without

determining whether a constitutional violation occurred.  Judge Baldock concurs

in part and dissents in part.  He concurs in the affirmance of summary judgment

in favor of Defendants Jaime Casado and Shaylene Platero, but he dissents as to

Defendants Paco Luna and Doña Ana County, concluding (1) Sergeant Luna

violated A.L.'s clearly established constitutional right to protection from

violence, and (2) Doña Ana County should also be liable for that violation.

---

[1]  A majority of this court likewise affirms the district court's decision to
grant summary judgment to the municipality.  Chief Judge Tymkovich concurs on
the basis that no constitutional violation occurred, which forecloses municipal
liability entirely.  Judge Carson concurs on the basis that—although qualified
immunity only shields individuals—municipal liability for claims of deliberate
indifference must follow only from clearly established constitutional violations.

18-2176, *Contreras v. Doña Ana Board of County Commissioners*

**TYMKOVICH**, Chief Judge, concurring.

In my view, Ms. Contreras has failed not only to demonstrate the violation of a clearly established constitutional right, but also the violation of a constitutional right at all.

# I. Background

On the evening of May 3, 2016, A.L. was booked into the Doña Ana County Detention Center (DACDC) for violating terms associated with his probation. As A.L. was led to his cell, three other detainees—A.H., J.S., and J.V.—spontaneously began banging on their cell doors and yelling to A.L. that they "were gonna f\*\*k him up."

In response, corrections officers placed all three aggressors on pre-disciplinary lockdown ("pre-disc"), which imposed a number of restrictions. While subject to pre-disc, A.H., J.S., and J.V. could only leave their cells for one of several enumerated purposes, and never at the same time. This regime also proscribed any contact with A.L. And it likewise sought to restrict communication among the three aggressors.

The next morning, Officer Casado, Cadet Platero, and Sergeant Luna were in the common area on the first floor of the juvenile pod. While A.L., J.S., and J.V. remained locked in separate cells on the second floor, A.H. obtained

permission to leave his cell for the permissible purpose of a shower. The shower room sat on the first floor, just adjacent to the common area.

Video indicates all three corrections officers watched television in the common area as A.H. finished his shower. Consistent with the restrictions imposed by A.H.'s pre-disc, no other detainee appeared outside of the locked cells. Upon exiting the shower room, A.H. entered the common area, which houses both the commissary kiosk and the touchscreen control panel. The record discloses that Officer Casado had left the control panel unlocked.

A.H. obtained permission from Sergeant Luna to use the commissary kiosk. But as he stands at the kiosk, the video suggests A.H. glances over his shoulder to check whether the corrections officers were paying attention. He then walks off-screen. Moments later, one of the corrections officers—evidently recognizing something amiss—stands suddenly as A.H. reappears onscreen. Around this same time, J.S. and J.V. flee their newly-unlocked cells.

They enter A.L.'s cell, closing the door behind them. J.S. and J.V. then begin assaulting A.L. As they do so, A.H. runs upstairs and locks himself inside his own cell, before Officer Casado can catch him. From downstairs, Cadet Platero re-opens A.L.'s cell. Sergeant Luna eventually subdues A.L.'s attackers with pepper spray. All of this transpires within twenty seconds.

## II. Analysis

Ms. Contreras contends the district court erred in concluding the corrections officers' behavior did not violate a clearly-established constitutional right to protection from violence.[1]

We review *de novo* the district court's decision to grant summary judgment. *E.g.*, *Lindsey v. Hyler*, 918 F.3d 1109, 1113 (10th Cir. 2019) (citing *Trask v. Franco*, 446 F.3d 1036, 1043 (10th Cir. 2006) ("On appeal, we review the award of summary judgment based on qualified immunity *de novo*.")). Summary judgment becomes appropriate when there exists no genuine dispute of material fact, such that the moving party is entitled to judgment as a matter of law. *Id*. (citing Fed. R. Civ. P. 56(a)).

In conducting this exercise, we consider evidence and draw inferences in the manner most favorable to the non-moving party. *Id*. (citing *Schutz v. Thorne*, 415 F.3d 1128, 1132 (10th Cir. 2005)). But where, as here, a defendant asserts qualified immunity, the plaintiff must also demonstrate that (1) the defendant violated a constitutional right, and (2) the constitutional right was "clearly established" at the time the violation transpired. *Id*. (citing *Medina v. Cram*, 252

---

[1]  I do not dispute that the officers acted negligently, but our precedent mandates that negligent conduct cannot form the basis for relief under § 1983. *See, e.g.*, *Davidson v. Cannon*, 474 U.S. 344, 347 (1986) (citing *Daniels v. Williams*, 474 U.S. 327 (1986)).

F.3d 1124, 1128 (10th Cir. 2001)). Unless the plaintiff can satisfy both requirements, the defendant will prevail.

We examine each requirement in turn.

### A. Constitutional Violation

The Supreme Court has explained that "the treatment a prisoner receives . . . and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."[2] *Helling v. McKinney*, 509 U.S. 25, 31 (1993). The Court has accordingly construed the Eighth Amendment's prohibition against "cruel and unusual punishments" to encompass certain "restraints on prison officials." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). For example, officials may not apply "excessive" physical force against inmates. *Id*. (citing *Hudson v. McMillian*, 503 U.S. 1 (1992)).

The Supreme Court has likewise held that the Eighth Amendment imposes certain affirmative obligations upon prison officials. Among these obligations are provisions for "adequate food, clothing, shelter, and medical care." *Id*. (citing

---

[2] At the time of the assault, A.L. was a pretrial detainee, rather than a convicted prisoner. We accordingly consider this lawsuit under the Fourteenth Amendment's provision for due process, although the Eighth Amendment's prohibition against "cruel and unusual punishments" guides our analysis. *E.g.*, *Perry v. Durborow*, 892 F.3d 1116, 1121 (10th Cir. 2018) (citing *Lopez v. LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir. 1999) ("Pretrial detainees are protected under the Due Process Clause rather than the Eighth Amendment. In determining whether [pretrial detainee's] rights were violated, however, we apply an analysis identical to that applied in Eighth Amendment cases . . .")).

*Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)).  Most importantly for present purposes, the Court has held that prison officials "must take reasonable measures to guarantee the safety of [] inmates []."  *Id*. (citing same).

To the extent prison officials manifest deliberate indifference to any of these affirmative obligations, injured parties may seek redress under § 1983.  *E.g.*, *Estelle v. Gamble*, 429 U.S. 97, 104–06 (1976).  But this cause of action does not imply that "every injury suffered by one prisoner at the hands of another will translate into constitutional liability for prison officials responsible for the victim's safety."  *Farmer*, 511 U.S. at 834 (cleaned up).

To prevail on a constitutional claim for "deliberate indifference," a plaintiff must demonstrate both an objective and a subjective failure on the part of prison officials.  *Id*; *see also Smith v. Cummings,* 445 F.3d 1254, 1258 (10th Cir. 2006) ("[T]he plaintiff must show that he is incarcerated under conditions posing a substantial risk of serious harm, the objective component, and that the prison official was deliberately indifferent to his safety, the subjective component.").

### 1. *Objective Inquiry*

Where a § 1983 action is premised "on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm."  *See id*. (citations and internal quotation marks omitted); *see also Howard v. Waide*, 534 F.3d 1227, 1236 (10th Cir. 2008) ("First, the alleged

deprivation must be sufficiently serious under an objective standard. In cases involving a failure to prevent harm, this means that the prisoner must show that the conditions of his incarceration present an *objective substantial risk of serious harm*." (emphasis added) (citing *Smith,* 445 F.3d at 1258)).

And where the plaintiff alleges deliberate indifference to the threats inmates may pose to one another, he must demonstrate a connection between the conditions of incarceration and the substantial (and particularized) risk of serious harm. *See, e.g.*, *Verdecia v. Adams*, 327 F.3d 1171, 1175 (10th Cir. 2003) ("To establish a cognizable Eighth Amendment claim for failure to protect [an inmate from harm by other inmates], the plaintiff must show that he [was] incarcerated under conditions posing *a substantial risk of serious harm*[,] the objective component . . .") (emphasis added) (citations and quotation marks omitted)).[3]

To the extent any cognizable risk arose from the circumstances the corrections officers faced in this case, it was the possibility that A.H., J.S., and J.V. might make good on their threats to assault A.L., if given the opportunity. The record, however, discloses that corrections officers separated the detainees

---

[3] In analogous circumstances, we have held that substantial risk of serious harm may exist "where prison officials disregard *repeated* warnings of danger to a particular prisoner and *continually* refuse to make the situation safer, for example by [] separating the prisoner from other inmates who previously have attacked him on *multiple* occasions." *Grimsley v. MacKay*, 93 F.3d 676, 681 (10th Cir. 1996) (emphases added) (citations omitted).

from one another and from A.L. by imposing "pre-disc" requirements on A.H., J.S., and J.V. *immediately upon their first and only threats to* A.L. Corrections officers accordingly restricted the movements of A.H., J.S., and J.V., such that they were not permitted any contact with A.L., one another, or other detainees. Such defensive action on the part of the corrections officers cannot be characterized as objective disregard of substantial risk of serious harm.[4]

It is, of course, true that—despite these precautions—Officer Casado left the control panel unlocked when A.H. exited his cell to shower. And that doing so—whether consciously or not, and whether A.H. knew the panel was unlocked or not—created *some* risk that A.H. might access the control panel, despite the presence of two additional corrections officers nearby and the absence of any other detainees in the common area.

It is likewise true these circumstances created some risk that A.H. might somehow coordinate with J.S. and J.V.—who were segregated from one another upstairs—to unlock A.L.'s cell. And that none of the three corrections officers present would intervene before some combination of A.H., J.S., and J.V. made

---

[4] Judge Baldock concludes the plaintiff has satisfied her burden to demonstrate an objective and substantial risk of serious harm. But in reaching that conclusion, he insists that reasonableness requires protective measures sufficient to "ensure A.L.'s safety." Concurring & Dissenting Op. at 14. The failure to prevent harm, however, cannot on its own establish an objective disregard of substantial risk. Put another way, Judge Baldock's conclusion relies on the fact of the assault to establish its likelihood.

good on their threats against A.L. In my view, however, this cascade of unlikely events should not overshadow the countervailing reality that corrections officers responded swiftly and decisively to the sole incidence of threats directed against A.L. by imposing "pre-disc" on A.H., J.S., and J.V.

Given the unlikelihood that A.H.—while subject to "pre-disc"—would successfully access the unlocked control panel in the presence of three corrections officers, I would describe the risk these circumstances posed to A.L. as attenuated, rather than substantial. I would accordingly conclude the plaintiff has failed to demonstrate the requisite substantial risk of serious harm to carry her burden under the objective component of our inquiry.

## 2. *Subjective Inquiry*

I would also conclude the corrections officers lacked awareness of the facts necessary to infer subjective knowledge of this risk. Our subjective inquiry requires that prison officials manifest *actual knowledge* of facts from which an inference could be drawn regarding the existence of a substantial risk. *Farmer*, 511 U.S. at 837. The Supreme Court has likewise emphasized that prison officials *must actually draw the appropriate inference*. *Id*. at 837–38 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.").

As a threshold observation, the record discloses nothing to suggest the corrections officers *actually drew the inference* of substantial risk to A.L. To be sure, the record certainly suggests some level of negligence. Taken as a whole, however, the fact that three officers allowed A.H.—and *only* A.H.—outside of his cell while the control panel remains unlocked does not satisfy the subjective inquiry's requirement of actual knowledge.

As Judge Carson's concurring opinion acknowledges, and as Judge Baldock argues in his partial dissent, the case against Sergeant Luna is strongest, on account of his firsthand experience with at least one prior incident of unauthorized access.[5] But even if Sergeant Luna or the others were familiar with these incidents, I do not believe we can conclude they actually drew the inference of substantial risk to A.L. For one, all of these incidents transpired more than a

_____

[5] The record discloses four incidents involving the control panel in the eighteen months that preceded this assault. Two of these cases—October 2014 and February 2015, respectively—apparently involved detainees taunting corrections officers. In the latter instance, the incident report lists Sergeant Luna as the supervising officer. Two other incidents—November 2014 and January 2015, respectively—bear greater similarity to the circumstances of this case. In November 2014, one detainee lured the sole corrections officer present to a nearby closet on the pretext of retrieving a mop so that a second detainee could access the control panel and unlock cells occupied by a third co-conspirator and their eventual victim. The third detainee then attacked the victim in his newly-unlocked cell. In January 2015, a single detainee somehow accessed the control panel to unlock another detainee's cell. It is not clear whether any of the cases involved detainees in pre disc.

year before the attack on A.L.  Moreover, only two of them actually involved detainee-on-detainee violence.

From what best I can discern from the record, both incidents involved readily-distinguishable factual circumstances.  In the first incident, one detainee lured the duty officer to a nearby closet on pretext of retrieving a mop so that a second detainee could access the control panel and unlock cells occupied by a third co-conspirator and their eventual victim.  Notwithstanding a superficial resemblance, several significant differences undermine the connection between this incident and the assault on A.L.  As a condition of "pre-disc," A.H. was the sole detainee permitted in the common area.  And three corrections officers—as opposed to just one—observed his movements from their perch, just yards away from the commissary kiosk and the control panel.

The record discloses fewer specifics about the details of the second incident.  But we know a single detainee somehow accessed the control panel to unlock another detainee's cell.  And that he attacked the second detainee.  The record does not disclose whether other detainees were present within the common area, or how many, if any, corrections officers might have been supervising the detainees.  For these reasons, I would conclude the same logic that undermines the applicability of the previous incident to the assault on A.L. applies to this incident.

None of these distinctions should excuse the non-constitutional significance of these incidents. Whenever a detainee—particularly a juvenile—suffers violence at the hands of another detainee, it is important for the facility to identify and to address whatever underlying issues may have contributed to that harm. By the same token, we must acknowledge that not every wrong will sound in constitutional right and remedy. And—in part because these prior incidents present distinguishable factual circumstances—I cannot infer subjective knowledge of the supposed substantial risk these circumstances posed to A.L.

To the extent, moreover, that we did infer subjective knowledge, Ms. Contreras has provided no evidence to suggest the corrections officers actually reached that inference. Even if I shared the conviction that reasonable corrections officers should have inferred A.H.'s plans from two previous incidents that transpired more than a year prior to these events, the Supreme Court has emphasized that the Eighth Amendment requires more than ordinary recklessness: "[W]e cannot accept petitioner's argument . . . that a prison official who was unaware of the substantial risk of harm to an inmate may nevertheless be held liable under the Eighth Amendment if the risk was obvious and a reasonable prison official *would have* noticed it." *See Farmer*, 511 U.S. at 841–42 (emphasis added). Said simply, we do not require corrections officers to read minds.

Although the corrections officers sought to protect A.L. from harm, it seems likely that negligence undermined their efforts. Negligence offers much cause for concern here; but precedent tells us it cannot elicit constitutional intervention. *See, e.g.*, *Berry v. City of Muskogee*, 900 F.2d 1489, 1495–96 (10th Cir. 1990) (observing that deliberate indifference requires a greater degree of fault than negligence or gross negligence). To be clear, the facility likely could have addressed the risk of detainee-on-detainee violence more effectively. But we must abide by the Supreme Court's mandate to assess both objective risk and subjective awareness of that risk.

The subjective inquiry requires that we ask whether the officers knew of a substantial risk and consciously disregarded the dangers that risk posed to A.L. I cannot infer subjective knowledge of any substantial risk to A.L. from this record. And no evidence indicates the corrections officers manifested the requisite actual knowledge of this risk, in any event. I would accordingly conclude that Ms. Contreras has failed to carry her burden.

## B. *Clearly Established Law*

Even if we were to conclude a constitutional violation had occurred, the circumstances of this case nonetheless cannot satisfy the rigorous standards the Supreme Court has articulated for clearly established law. A "clearly established right is one that is sufficiently clear that every reasonable official would have

understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (citations and quotation marks omitted).

We need not "require a case directly on point," but the Supreme Court has cautioned that "existing precedent must have placed the statutory or constitutional question beyond debate." *Id*. (citations and quotation marks omitted). This is because qualified immunity is meant to "protect[] all but the plainly incompetent or those who knowingly violate the law." *Id*. (citations and quotation marks omitted). The Supreme Court has repeatedly instructed lower courts "not to define clearly established law at a high level of generality." *Id*. (citations and quotation marks omitted).

As the Court has likewise emphasized "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established." *Id*. (citations and quotation marks omitted) (emphasis in original). Such an inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id*. (citations and quotation marks omitted) (emphasis added).

Ms. Contreras frames the constitutional violation at a high level of generality: "[A] known but disregarded threat to an inmate's physical safety, combined with evidence of prior assaults and information about a specific threat can establish deliberate indifference." Aplt. Br. 21. As a threshold matter, I

-13-

doubt this formulation can satisfy the rigorous standards for specificity required by the Supreme Court.[6] *See Mullenix,* 136 S. Ct. at 308.

But even if—for the sake of argument—we take this rule as given, the two Tenth Circuit authorities cited most extensively by Ms. Contreras, *Berry v. City of Muskogee*, 900 F.2d 1489 (10th Cir. 1990), and *Howard v. Waide*, 534 F.3d 1227 (10th Cir. 2008), do not yield fair notice of a constitutional violation in this case.

In *Berry*, we held that a reasonable jury could conclude corrections officers had manifested deliberate indifference to the prospect of violence when one inmate was murdered by two others he had testified against at trial. 900 F.2d at 1498. Several observations readily distinguish this case from *Berry*. For one, the corrections officers in *Berry* took *no* action upon learning of the potential threat posed by the inmate's co-defendants. In this matter, by contrast, corrections officers placed all three aggressors onto "pre-disc" immediately upon their first and only threats to A.L.

Moreover, in *Berry* the perpetrators freely roamed the facility to access the murder weapon—a wire from a broom stored in a common area—under the

---

[6] As Judge Carson acknowledges, we have previously applied a "sliding scale" analysis to determine whether clearly established law prohibits official conduct. I share his reservations regarding the "sliding scale" approach, given recent guidance from the Supreme Court. *See also* Mark. D. Standridge, *Requiem for the Sliding Scale: The Quiet Ascent—and Slow Death—of the Tenth Circuit's Peculiar Approach to Qualified Immunity*, 20 Wyo. L. Rev. 43 (2020).

nominal supervision of just one corrections officer. *Id*. at 1497. In this case—on account of the "pre-disc" precautions we have already discussed—A.H. was permitted outside of his cell only when other detainees were locked securely within theirs. And only then when not one, but three officers were present to oversee his activities. In our view, *Berry* cannot clearly establish a constitutional violation under the circumstances we now consider.

In *Howard*, we reversed the district court's decision granting summary judgment to corrections officers who failed to intervene when a newly-transferred inmate complained that members of the same prison gang who sexually abused him at a prior facility once again had begun to threaten him. 534 F.3d at 1241–42. The inmate was sexually assaulted three times before corrections officers acted on his request to be relocated to a facility that did not contain members of this gang. *Id*. at 1233–34.

In my view, the same central observation that distinguished this case from *Berry* applies with equal force to *Howard*. Here, corrections officers placed all three aggressors onto "pre-disc" lockdown *as soon as they threatened A.L.* Of course, Sergeant Luna, Officer Casado, and Cadet Platero should have been *more* attentive. Perhaps *more* suspicious, too. And certainly *less* distracted by the television. But we cannot ascribe constitutional significance to their negligence.

Both *Berry* and *Howard* clearly establish that credible threats merit reasonable response. These authorities *do not*, however, demand perfection under the challenging circumstances that corrections officers often confront; for the Supreme Court has observed that "not . . . every injury suffered by one prisoner at the hands of another [will] translate into constitutional liability." *Farmer*, 511 U.S. at 834 (cleaned up).

The out-of-circuit authorities cited by Ms. Contreras fare little better. In *Erickson v. Holloway*, 77 F.3d 1078, 1080 (8th Cir. 1996), an inmate accessed an electronic control panel only after corrections officers left the room that housed the panel *entirely unattended for six minutes*. Given the Supreme Court's insistence that we contemplate "the specific context of [this] case," a world of difference separates the facts of *Erickson* from the situation we confront. *See Mullenix* 136 S. Ct. at 308. After all, Sergeant Luna, Officer Casado, and Cadet Platero never left the common room unattended for any period of time.

The same problem undermines Ms. Contreras' reliance upon *Street v. Corrs. Corp. of Am.*, 102 F.3d 810 (6th Cir. 1996). In that case, a corrections officer—using an electronic control panel—opened every door in the unit after one inmate had threatened to assault another. *See id*. at 813–14. The inmate made good on this threat, and the Sixth Circuit reversed the district court's decision granting summary judgment to the corrections officer. *Id*. at 816. In this

case, by contrast, Sergeant Luna, Officer Casado, and Cadet Platero imposed and enforced a regime of "pre-disc" lockdown against A.H. and his co-conspirators that sought to mitigate the risks all three aggressors might pose to A.L.

Nor does the final authority Ms. Contreras cites extensively, *Junior v. Anderson*, 724 F.3d 812 (7th Cir. 2013), clearly establish a constitutional violation under these circumstances. In that case, a corrections officer all but ignored the revelation that two cells that should have been secured remained unlocked. *See id.* at 813–14. After an inmate who should have been secured in one of these cells subsequently joined several others in attacking another prisoner, the Seventh Circuit reversed the district court's decision granting summary judgment to the corrections officer, *who had also abandoned her post for at least fifteen minutes. See id.* at 815.

In my view, the same differences that distinguish *Erickson* and *Street* from "the specific context of [this] case" also diminish the significance of *Junior. See Mullenix* 136 S. Ct. at 308. Although the record discloses that Officer Casado and Cadet Platero may have realized that the control panel remained unsecured, only *one* detainee—A.H., who was subject to "pre-disc" lockdown—was present in the common area. And all three corrections officers remained just steps away from their charge, as well as the electronic control panel.

It is, of course, true that some "constitutional violation[s] may be so obvious that similar conduct seldom arises in our cases," such that "it would be remarkable if the most obviously unconstitutional conduct should be the most immune from liability only because it is so flagrantly unlawful that few dare its attempt." *Lowe v. Raemisch*, 864 F.3d 1205, 1210–11 (10th Cir. 2017) (citations and quotation marks omitted). But we have construed this functional exception to the presumption against fair notice quite narrowly, as we must effectively conclude "our precedents render the legality of the conduct undebatable." *See id*. at 1211 (citing *Aldaba v. Pickens*, 844 F.3d 870, 877 (10th Cir. 2016)). This is not such a case.

In sum, no authorities clearly establish a constitutional violation under these circumstances.

## III. Conclusion

For the reasons previously articulated, I would affirm the district court's decision to grant summary judgment in this matter.

18-2176, Contreras v. Dona Ana Board of County Commissioners

**CARSON**, J., Concurring in part and concurring in the judgment

Make no mistake. We expect corrections officers to protect those under their supervision—especially children. The officers here—more attuned to a television show than the juveniles in their charge—allowed violent inmates to brutally assault A.L. I find their failure to protect A.L. inexcusable. But 42 U.S.C. § 1983 provides no remedy to Plaintiff for unprofessional or negligent conduct. Instead, Plaintiff may only recover against the officers if they violated a clearly established constitutional right. We begin, therefore, by determining whether Plaintiff has met her burden.

Plaintiff credibly argues that the officers' conduct violated A.L's constitutional rights. She presents a strong case against the supervisor—Officer Luna. After all, he knew that inmates previously accessed the control panel to commit violence against one another. But the other officers did not share Luna's prior knowledge. So the case against them is not so clear.

Even so, I would not reach the constitutional question because, even if the officers violated A.L's constitutional rights, those rights were not clearly established. When our body of caselaw contains no case with remarkably similar facts, we look to a "sliding scale" analysis to determine whether clearly established law prohibited an officer's conduct. Casey v. City of Fed. Heights, 509 F.3d 1278, 1284 (10th Cir. 2007). Under the sliding scale, the worse the conduct given prevailing constitutional principles, the less specificity is required from prior caselaw to clearly establish the violation. Id.

Some recent decisions suggest the sliding scale approach may conflict with current Supreme Court authority, but no case has overruled it.  See  Lowe v. Raemisch, 864 F.3d 1205, 1211 n.10 (10th Cir. 2017) (noting our sliding scale approach may allow us to find a clearly established right even when a precedent is neither on point nor obviously applicable); Aldaba v. Pickens, 844 F.3d 870, 874 n.1 (10th Cir. 2016).  With no case overruling it, the sliding-scale approach lives in this Circuit.  But that said, we must apply it cautiously as contemporary Supreme Court cases require an ever-increasing level of factual similarity for prior decisions to place a statutory or constitutional question beyond debate.[1]  Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (emphasizing that Court has repeatedly told lower courts not to define clearly established law at a high level of generality).

I view this case as exceedingly close on both prongs of the qualified immunity analysis.  Ultimately, however, I conclude the precedents from this Circuit and the Supreme Court do not place the constitutional question beyond debate (even considering the sliding scale approach).  Plaintiff's claims must therefore fail against the individual officers.  So I join Chief Judge Tymkovich's opinion as far as it addresses the "clearly established" prong of the qualified immunity analysis.  Because I would not reach the

---

[1] The Supreme Court has remanded at least one case we decided under the sliding scale approach for further consideration of whether the relevant body of law "clearly established" a constitutional question.  Pickens v. Aldaba, 136 S. Ct. 479 (2015). Although we originally decided the sliding scale warranted finding a right "clearly established," on remand we determined our prior caselaw did not sufficiently mirror the factual circumstances of the case to sustain that finding.  Aldaba, 844 F.3d at 879.

constitutional question, I join neither Judge Baldock's nor Judge Tymkovich's well-presented analysis of that issue.

That leaves Plaintiff's Monell claim against the Board. The district court determined that Plaintiff's claim against the Board failed as a matter of law because she did not satisfy the third element for municipal liability—deliberate indifference. The district court determined that the Board could not be *deliberately* indifferent to a constitutional right unless the right is clearly established. See, e.g., Arrington-Bey v. City of Bedford Heights, 858 F.3d 988, 994 (6th Cir. 2017). And because the district court found the right was not clearly established, it ruled the Board could not have been deliberately indifferent to A.L.'s rights. I agree.

Whether a municipal policymaker can be liable for deliberate indifference to a constitutional right that has not yet been established is an interesting one. And the answer depends on the type of claim alleged against the municipality. Consider first a claim based directly on a municipal act such as the termination of a municipal employee without due process. In that case, "the violated right need not be clearly established because fault and causation obviously belong to the city." Arrington-Bey, 858 F.3d at 994–95.

But then consider a claim based on a municipality's failure to properly train its employees. There, the theory stems from the municipality's failure to teach its employees not to violate a person's constitutional rights. In that posture, the "municipality's alleged responsibility for a constitutional violation stems from an *employee*'s unconstitutional act [and the municipality's] failure to prevent the harm must

3

be shown to be deliberate under 'rigorous requirements of culpability and causation.'" Id. at 995 (quoting Bd. of Cty. Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 415 (1997)). Thus, the violated right in a failure to train case "must be clearly established because a municipality cannot *deliberately* shirk a constitutional duty unless that duty is clear. Id. The Second, Sixth, and Eighth Circuits have each reached this conclusion. Townes v. City of New York, 176 F.3d 138, 143–44 (2d Cir. 1999); Arrington-Bey, 858 F.3d at 995; Szabla v. City of Brooklyn Park, 486 F.3d 385, 393 (8th Cir. 2007) (en banc).

Judge Baldock believes that in application this means the district court inappropriately granted the Board qualified immunity. I agree that municipalities cannot invoke the doctrine of qualified immunity. Owen v. City of Independence, 445 U.S. 622, 624–25 (1980) (holding that municipalities cannot assert the doctrine of qualified immunity). But this case differs remarkably from Owen. Owen arose from a claim of deliberate municipal indifference where the municipality directly caused the constitutional injury. Id. at 633. Here, by contrast, Plaintiff advances a failure to train theory in which she "must show not only that an employee's act caused a constitutional tort, but also that the city's failure to train its employees caused the employee's violation *and* that the city culpably declined to train its 'employees to handle recurring situations presenting an obvious potential for such a violation.'" Arrington-Bey, 858 F.3d at 995 (citing Brown, 520 U.S. at 409). The Supreme Court's statement "obvious potential for such a violation" requires that the constitutional violation be obvious (i.e., clearly established). Requiring that the right be clearly established in this context does not give

4

qualified immunity to municipalities; it simply follows the Supreme Court's demand "that deliberate indifference in fact be deliberate." Arrington-Bey, 858 F.3d at 995 (citing Szabla, 486 F.3d at 394).

Plaintiff alleged the County engaged in deliberate indifference by failing to adequately train its correction officers. For the reasons discussed above, however, Plaintiff's claim must fail because she cannot show the right the Board violated was obvious. I would therefore affirm the district court's order granting summary judgment to the Board on the Monell claim. I thus concur in the judgment on the Monell claim, although on a different ground than Chief Judge Tymkovich who concluded no constitutional violation occurred.

For these reasons, I respectfully concur in part and concur in the judgment.

18-2176, *Contreras v. Doña Ana Board of County Commissioners*

**BALDOCK**, Circuit Judge, concurring in part, dissenting in part.[1]

Corrections officers cannot absolutely guarantee the safety of those in their care. Nor does the Constitution sweep so broadly as to require every cell in a detention center to always remain locked for the protection of its guests. But after violent threats have been made by a group of particularly violent detainees, any reasonable official cognizant of his duty to protect would know that the failure to secure the control panel while a would-be assailant is outside his cell is objectively unreasonable.

As my colleagues accurately point out, qualified immunity protects "all but the plainly incompetent." Concurring Op. at 13 (Tymkovich, C.J.) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam)). Because Sergeant Luna's conduct was plainly incompetent, qualified immunity should afford him no shelter. And because Doña Ana County Detention Center (DACDC) was deliberately indifferent to a pattern of tortious conduct by its employees, it cannot be shielded from liability on the ground that A.L.'s asserted constitutional right was not clearly established. For these reasons, I would reverse the district court's grant of summary judgment to Sergeant Luna and the DACDC and remand for further proceedings. I therefore respectfully dissent.

---

[1] The parties have my apologies for the delay in issuing this decision. Unfortunately, too many cases in our civil justice system today drag on for far too long. My colleagues and I strive to counteract this lamentable trend by efficiently resolving appeals. But sometimes we fail, and it is the parties who must bear the burden of our shortcomings.

I.

The historical facts relevant to this appeal, unlike the inferences to be drawn from them, are undisputed.[2] On the evening of May 3, 2016, officials booked A.L., then fourteen years old, into the DACDC after he allegedly violated his probation by disregarding his curfew. At the time of A.L.'s detention, the three juveniles responsible for the forthcoming attack on him, J.V., J.S., and A.H., were also detained at the DACDC. All three juveniles had exhibited disciplinary problems just days and hours prior to their attack on A.L.

On April 25, 2016, for example, J.S. attacked another juvenile detainee in the dayroom "by punching him several times in the face." Three other detainees were soon attacking the victim as well. J.S. stated he attacked the victim because he "had been talking shit the day before." DACDC officials placed J.S. on "pre-disciplinary lockdown" (pre-disc) for his aberrant behavior.

A.H was also placed on pre-disc on April 22. A DACDC caseworker's notes on A.H. indicate that on April 25 "[p]er Sgt. Luna[,] [A.H.] is not able to go to medical for lab draw due to inmate being aggressive and uncooperative with staff at this time. Per Sgt. Luna[,] 'it is not safe to take [A.H.] out of his cell.' Will continue to monitor." As reflected by a psychiatrist's evaluation report, A.H. believed he had an "anger problem" and that "people [were] wanting to get [him]." A.H. stated: "I go off on everyone when I get mad."

---

[2] To properly analyze whether Plaintiff has carried her burden to withstand the defense of qualified immunity at the summary judgment stage, one must begin by considering *all material facts* contained in the record. Chief Judge Tymkovich conspicuously discounts, among other things, recent past incidents in the DACDC juvenile pod where detainees accessed the control panel and the three assailants' known violent tendencies—in particular those of A.H.

When A.H. was taken off pre-disc on April 30 and allowed to leave his cell, he wasted no time in yelling out "it's time to get on lockdown again." Moments later, A.H. approached a table in the dayroom where J.V. sat with J.S. and said something to J.S. At this point, J.V. and A.H. began to argue. J.V. then stood up and "went towards [A.H.] and began punching him in the face and head with closed fists. [A.H.] . . . punched back with closed fists." After officers separated the two miscreants and medical staff cleared A.H., he returned to the dayroom. There, A.H continued his disruptive behavior by yelling "obscenities and gang slurs toward [J.V.]," causing yet another fight. J.V. reported the fight broke out because "[A.H.] kept talking 'shit' to him and . . . went after him." As a result of their altercation, both J.V. and A.H. were placed on pre-disc.

Following lockdown around 9:30 p.m. on May 3, the evening before the attack on A.L., the three soon-to-be assailants, all fresh off pre-disc, once again became disruptive. J.V. began banging on his cell door, broke his county-issued cup and deodorant stick, and covered his cell window with his mattress and sheets. Even after the officer on duty uncovered J.V.'s window, he continued to bang and kick on his door. Around 10:15 p.m., J.S. and A.H. joined J.V. and began kicking on their cell doors. The juveniles refused to discontinue their disruptive behavior.

Around 10:22 p.m., officials brought A.L. into the juvenile pod's dayroom. The dayroom is surrounded by two levels of individual cells. J.V., J.S., and A.H. were housed separately on the pod's second level. When A.L. entered the dayroom, the trio began yelling at A.L., telling him they were going to "fuck him up." A.L. was placed in a cell on

3

the second level near the others. As a result of their disruptive behaviors and threats, J.V., J.S., and A.H. were again placed on pre-disc. While on pre-disc, the three juveniles were to be confined to their cells except when they were individually permitted to engage in recreation time, shower, use the phone, and access the commissary kiosk. None of the three were allowed out of their cells while any one of the others or A.L. was out of his cell.

Shortly after 9:00 a.m. the next morning, A.H., still on pre-disc, was alone outside his cell. He had just finished showering in the shower room located on the north side of the dayroom. Consistent with their placement on pre-disc the night before, J.V. and J.S. remained locked in their cells, as did A.L. Defendants, Sergeant Luna, Officer Casado, and Cadet Platero, were sitting at tables in the juvenile pod's dayroom watching television. Officer Casado, who had been employed at the DACDC for just over a year, was the assigned dayroom officer. Sergeant Luna, the supervising officer, had been employed at the DACDC for twenty-three years. Cadet Platero had been employed at the DACDC for just over two months.

All three Defendants knew J.V., J.S., and A.H. had threatened to assault A.L. the night before and were on pre-disc as a result. The record is unclear as to whether Casado or Platero were aware of the precise nature of the trio's recent disciplinary problems at the DACDC, but Defendants' response brief tells us they knew the three were "generally violent." The brief also tells us Sergeant Luna knew the three had "histories of assault at DACDC." And Sergeant Luna specifically was aware, as illustrated by the caseworker's April 25 notes on A.H., that A.H. was a problem and *not to be trusted outside his cell*.

4

Located on the juvenile pod's west wall in front of where the individual Defendants were sitting was a commissary kiosk. Five to ten feet left of the kiosk, on a podium referred to as the "Officers' Platform Station," was a control panel used to electronically lock and unlock the juvenile pod's cell doors. The control panel is a touchscreen device that allows an officer to lock or unlock individual cell doors with the touch of a button after entry of a security code or password. Officers may log off or lock the panel with the touch of a button rendering it ineffective until someone with a security code once again logs in.

The closest thing in the record to a written DACDC policy about locking the control panel is found in a code of ethics contained in the "Standard Operating Procedures" manual for the DACDC. The code provides:

A.   If an officer is going to leave his workstation, it must either be locked or the officer must log off.

B.   If an officer happens to come upon a workstation that was left open and unlocked by another user, it is the officer's responsibility to log that user off and log in under their username and password if they are going to use it.

After showering, A.H. asked Sergeant Luna for permission to access the commissary kiosk. Sergeant Luna granted permission. On a security tape, one sees J.V. and J.S. standing in their second-level cells watching events transpire in the dayroom. As A.H. approached the kiosk, he looked over his shoulder to see if any of the Defendants were paying attention. They were watching TV. When A.H. sensed

5

his opportunity, he approached the control panel, which he obviously suspected might be unlocked (he was right), and proceeded to open J.V.'s, J.S.'s, and A.L.'s cell doors.

J.V. and J.S. immediately exited their cells and ran into A.L.'s neighboring cell, closing the door and causing it to lock behind them. Making good on their threats, J.V. and J.S. began to beat A.L. A.H. avoided Officer Casado's pursuit, ran up the stairs, and locked himself in his own cell while the chaos ensued. Sergeant Luna and Officer Casado ran upstairs to A.L.'s cell. Cadet Platero opened A.L.'s cell from the control panel down below. When J.V. and J.S. refused to stop beating A.L., Sergeant Luna doused the two with pepper spray. A.L. was transported to the hospital. As a result of the attack, he suffered a broken jaw, was rendered unconscious, and was left bleeding from both ears.

The day after the attack on A.L., Lieutenant Mendoza of the DACDC's Professional Standards Unit interviewed Sergeant Luna and Officer Casado. Officer Casado said this about securing the control panel in the juvenile pod:

> [Casado] did confirm that the control panel can be locked if needed but that he does not remember if he locked it in this instance. *He stated that he believes nobody on his shift logs off from the panel as normal practice when he walks away from the officers' podium. He stated that since he has been assigned to juvenile . . . he has never been directed to log off the panel.* He did confirm that he was the last person at the officers' podium before the incident occurred.

Sergeant Luna disagreed with Casado, however, when Mendoza questioned him about control panel procedures in the juvenile pod:

> I questioned [Sgt. Luna] regarding whether or not officers on his shift are locking the control panel when they locate themselves away from the podium. He stated that it is common practice for staff on his shift

6

to lock the panel but that he was not watching to see if Casado locked it in this instance. He stated that he has to assume that Casado would have locked it as other officers do, but he does not stand next to all officers each time they move away from the podium. He stated that ever since juvenile had been moved to the adult side, *there was never a directive given to him about locking the panel although it was getting done*.

Rather than submitting to an interview the day after the incident, Cadet Platero drafted a memorandum in which she indicated that "when she observed Officer Casado get up from his post at the officers' podium to sit at the table, she noticed that he did not lock the control panel that opens each cell in the dayroom." During an interview with Lieutenant Mendoza about three weeks after the incident, Platero confirmed that she witnessed "Officer Casado walk away from the officers' podium without locking the control panel."

Notably, in an affidavit executed two months after the attack on A.L., Officer Casado changed his story. Casado now attests that during his training at the DACDC, he was "specifically" told (I wonder by whom) that the policy of the DACDC was to log out of the control panel after he used it, rendering the control panel ineffective until someone with a security code once again logged in. Casado says he was "never" instructed nor allowed to leave the control panel unlocked.

Cadet Platero similarly attests that during her training she was instructed (I wonder by whom) on the use of the control panel: "I was trained that I should always lock or log out of a control panel before leaving it. Before the incident, I saw Casado leave the control panel unlocked which I knew to be a policy violation, but I did not alert anyone." Sergeant Luna attests that he instructs all officers under his supervision "to lock

7

all pods' control panels, including the juvenile pod." Sergeant Luna states he has "never" instructed a cadet or detention officer to leave the control panel unlocked at the DACDC; nor is he aware of any other sergeants or supervising officers ever having done so.

Importantly, A.H.'s unauthorized use of the unlocked control panel was not the first time a detainee at the DACDC had improperly accessed the control panel in the juvenile pod's dayroom. Juvenile detainees had accessed the control panel on at least four prior occasions beginning in October 2014, or about eighteen months prior to the attack on A.L. On October 25, 2014, a detainee insisted on crossing his body over the "red line" in front of the control panel. After being warned, the detainee again crossed the red line and leaned his body against the control panel. As a result, DACDC officials placed him on pre-disc. The fourth incident was much like the first. On February 12, 2015, a juvenile detainee at the DACDC "kept crossing the red line and laying [his] hands on the control panel." When the detainee crossed the line and touched the control panel a second time, he too was placed on pre-disc. The incident report lists Sergeant Luna as the juvenile pod's supervising officer at the time of this infraction.

Unfortunately, the second and third incidents involving a juvenile detainee's unauthorized access to the control panel were not so harmless. The similarities between those two incidents and the incident at issue are substantial. Less than a month after the first incident, on November 23, 2014, a juvenile detainee asked the officer on duty to retrieve a mop from the dayroom closet. When the officer did so, a second detainee accessed the dayroom's control panel, which was unlocked, and opened the cells of a third and fourth detainee. The third detainee then ran from his unlocked cell into the unlocked

8

cell of the fourth detainee and attacked him. After order had been restored, an assisting officer was escorting the third detainee to booking when he saw him toss a white object toward the trash can. The object was a sharpened portion of a toothbrush designed for use as a weapon.

A third incident occurred on January 20, 2015. On that date, a juvenile detainee attacked another detainee in the latter's cell. The assailant told officials that "he went towards the officers' desk, crossed the red line and opened the other detainee's cell by pushing a button on the dayroom [control] panel." The assailant admitted he went into the victim's cell and threw the first punch because the victim had called him a "snitch." According to the incident report, both detainees were placed on pre-disc and the "dayroom panel was disabled due to this incident." When the control panel in the juvenile pod again became operational is unclear from the record—certainly too soon from A.L.'s perspective.

II.

To survive summary judgment as to Defendants' individual liability under § 1983, Plaintiff must show (1) sufficient evidence exists for a factfinder to conclude one or more of the individual Defendants violated A.L.'s constitutional right to due process by failing to protect him from violence at the hands of other detainees, and (2) this right was clearly established at the time of the violation. *Matthews v. Bergdorf*, 889 F.3d 1136, 1143 (10th Cir. 2018). Because the individual Defendants assert the defense of qualified immunity, the burden is on Plaintiff to establish her right to proceed against *each* Defendant individually. *Id.* at 1144–45. Plaintiff has undoubtedly carried this burden with respect to her claim against Sergeant Luna.

A.

In determining whether A.L.'s constitutional rights were violated, we must view the evidence in the light most favorable to Plaintiff and refrain from resolving factual disputes in favor of the individual Defendants (i.e., the parties seeking summary judgment). *See McCoy v. Meyers*, 887 F.3d 1034, 1044–45 (10th Cir. 2018). When *all* the evidence is properly considered under this standard, a reasonable jury could find Sergeant Luna was deliberately indifferent to the substantial risk of harm with which J.V., J.S., and A.H. had threatened A.L.

1.

The point of departure for our inquiry into whether any of the individual Defendants caused A.L. to suffer a constitutional deprivation is the Supreme Court's decision in *Farmer v. Brennan*, 511 U.S. 825 (1994). *Farmer* established that the Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on officials to provide prisoners with "humane conditions of confinement." *Id.* at 832. Prison officials who are aware of a substantial risk to an inmate's safety have a duty to protect the inmate from harm and therefore must take reasonable steps to guarantee his safety. *Id.* at 832–33.

But of course, absent a formal adjudication of guilt against A.L., the Eighth Amendment has no application. *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979). Nevertheless, "[i]n evaluating the constitutionality of conditions . . . of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, . . . the proper inquiry is whether those conditions amount to punishment of the detainee."

*Id.* at 535. To determine whether the evidence is sufficient for a jury to find any or all of the individual Defendants "punished" A.L. and deprived him of liberty without due process of law in violation of the Fourteenth Amendment, Tenth Circuit precedent requires us to employ an analysis identical to the analysis we employ in Eighth Amendment cases challenging a prisoner's conditions of confinement under a failure-to-protect theory. *Perry v. Durborow*, 892 F.3d 1116, 1121 (10th Cir. 2018); *cf. Wolfish*, 441 U.S. at 546 n.28 (finding "no reason" to distinguish between pretrial detainees and convicted inmates in reviewing a correctional center's security practices).

Before a jury may find an individual Defendant violated A.L.'s right to due process, Plaintiff must satisfy two elements: one objective and one subjective. *Farmer*, 511 U.S. at 834. To satisfy the objective component, Plaintiff must show A.L. was detained "under conditions posing a substantial risk of serious harm." *Id.* If Plaintiff satisfies this objective prong, she must then establish that at least one of the individual Defendants was deliberately indifferent to the substantial risk A.L. faced. *Id.* This is a subjective inquiry. *Id.*

While "deliberate indifference entails something more than mere negligence, . . . it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while

11

no cause for commendation, cannot . . . be condemned as the infliction of punishment."[3]

*Id.* at 838. In short, "deliberate indifference is equivalent to recklessness in this context." *Smith v. Cummings*, 445 F.3d 1254, 1258 (10th Cir. 2006).

2.

On this record, viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that A.L. faced an "objective 'substantial risk of serious harm.'" *Howard v. Waide*, 534 F.3d 1227, 1236 (10th Cir. 2008) (quoting *Farmer*, 511 U.S. at 834). When DACDC officials escorted A.L. to his cell the night before the attack, three juvenile detainees with very recent histories of disciplinary

---

[3] In *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), the Supreme Court held an objective reasonableness standard governs excessive force claims brought by pretrial detainees under the Fourteenth Amendment. In *Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (en banc), the Ninth Circuit imaginatively interpreted *Kingsley* and held an objective standard also governs failure-to-protect claims of pretrial detainees raised under the Fourteenth Amendment. And In *Darnell v. Pineiro*, 849 F.3d 17 (2d Cir. 2017), the Second Circuit followed suit. For years, however, federal courts across the land, including the Tenth Circuit, have relied on *Wolfish* to apply *Farmer*'s subjective deliberate-indifference standard to claims that state actors failed to protect pretrial detainees in violation of the Fourteenth Amendment. *See, e.g.*, *Lopez v. LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir. 1999); *Walton v. Dawson*, 752 F.3d 1109, 1117–18 (8th Cir. 2014). To suggest *Kingsley* overturned such long-standing precedent, uninvited and *sub silentio*, simply proves too much. Absent the Supreme Court overturning its own precedent or our own, we are bound by it. And I suspect the Court may never do so because, as Judge Ikuta ably points out in her dissent to *Castro*, a fundamental difference exists between the *action* underlying an excessive force claim and the *inaction* underlying a deliberate-indifference claim: "[A] person who unknowingly fails to act—even when such a failure is objectively unreasonable —is negligent at most. And the Supreme Court has made clear that 'liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.'" *Castro*, 833 F.3d at 1086 (Ikuta, J., dissenting) (quoting *Kingsley*, 135 S. Ct. at 2472).

12

problems involving violent encounters at the DACDC, and housed in close proximity to A.L., directly threatened to "fuck him up" while raising a ruckus. As a result, the three juveniles, each of whom could turn violent with little warning, had been placed on pre-disc *precisely to alleviate a substantial risk of serious harm to A.L., themselves, and others*.

According to Defendants and Chief Judge Tymkovich, these circumstances did not present a substantial risk of harm because the juvenile assailants were placed on pre-disc and three corrections officers were present—physically, at least—in the dayroom when the attack occurred. Based on these "precautions," Defendants maintain that an unsecured control panel cannot, as a matter of law, result in § 1983 liability for failure to protect A.L. What this conclusion conveniently fails to acknowledge is this: A.H. was one very troubled and volatile miscreant on the loose within easy reach of an unlocked control panel. That panel provided ready access to J.V.'s, J.S.'s, and A.L.'s cells. And those cells were located upstairs in close proximity to one another but at a distance from Defendants downstairs, who were charged with the duty to protect A.L.

Because the kiosk and control panel were in such close proximity, and J.V.'s, J.S.'s, and A.L.'s cells were far removed from the control panel, a dozen DACDC guards in the dayroom watching TV would not have prevented A.H. from rushing the control panel and pushing the few buttons necessary to unlock the cell doors and facilitate the attack on A.L. After all, what did A.H. have to lose? Another placement on pre-disc? The facts well illustrate that A.H. could not have cared less whether he was on pre-disc. He was on pre-disc repeatedly. Under these circumstances, branding the attack

13

on A.L. as the culmination of a "cascade of unlikely events" and labeling the risk he faced as "attenuated," *see* Concurring Op. at 7–8 (Tymkovich, C.J.), wholly ignores both the reality of the situation presented and the reality of involuntary detention.

Defendants further argue the fact the three assailants, after threatening A.L., had been placed on pre-disc with its accompanying restrictions illustrates reasonable measures were taken to avert the attack. The question, however, is not whether placing the three miscreants on pre-disc was a reasonable thing to do. It surely was given the trio's recent unruly and violent behavior at the DACDC. But pre-disc is nothing more than a label. Its terms must be enforced by reasonable and appropriate measures.

The central question here is whether the individual Defendants acted reasonably by leaving the control panel unsecured given the circumstances described above. Placing the three juveniles on pre-disc and "segregating" them from each other and A.L. could not alone ensure A.L.'s safety if such segregation was not maintained through the implementation of reasonable measures such as securing the cell doors. "In determining whether prison officials acted reasonably, we consider what actions they took, if any, as well as available alternatives that might have been known to them"— like securing the juvenile pod's control panel *precisely because* the assailants were on pre-disc for threatening A.L. with bodily harm. *Howard*, 534 F.3d at 1240.

A.H. was a known problem with a recent history of violent outbursts at the DACDC. In fact, just one week before the attack on A.L., Sergeant Luna reported it was not safe to take A.H. out of his cell. Half measures—such as sitting in the juvenile pod watching TV near an unlocked control panel while A.H. wandered the dayroom—availed A.L. nothing.

14

Defendants' delayed reactions when A.H. rushed the control panel, as the video of the incident shows, belies any claim that the corrections officers "observed his movements from their perch[.]" *See* Concurring Op. at 7–8 (Tymkovich, C.J.).

Just as the effectiveness of prison segregation depended on keeping cell door keys out of the hands of would-be assailants prior to advances in technology, the effectiveness of the segregation in this case depended on the control panel being locked and inaccessible—a wholly unremarkable proposition. As Defendants admit in their brief: "*Excluding* the unlocked control panel and [A.H.'s] access to it, DACDC's preventative discipline and supervision were reasonable." (emphasis added). With that much I agree. Thus, I would conclude that Plaintiff has created a triable issue as to whether the individual Defendants disregarded the substantial risk of serious harm A.L. faced "by failing to take reasonable measures to abate it." *See Farmer*, 511 U.S. at 847.

3.

The next question is whether a reasonable jury could find any of the individual Defendants recklessly disregarded the risk of serious harm to A.L when the control panel was left unlocked and accessible to A.H. on the morning of the attack. A jury cannot decide a detention center official's failure to protect a victim amounted to deliberate indifference if they preliminarily find he or she failed to perceive the significant risk of harm to the victim, no matter how objectively obvious. *Id.* at 838. Where the risk is obvious such that a reasonable person would realize it, a jury certainly may infer that a defendant did in fact realize it. *Id.* at 842. Such an inference cannot be conclusive, however, "for we know that

15

people are not always conscious of what reasonable people would be conscious of." *Id.* (quoting 1 W. LaFave & A. Scott, *Substantive Criminal Law* § 3.7, p. 335 (1986)).

Although it is an extremely close call, I would conclude that Plaintiff has failed to carry her burden on the subjective prong with respect to Officer Casado and Cadet Platero. To be sure, sufficient evidence exists to conclude these Defendants knew they were required to keep the control panel locked when not in use. Cadet Platero also knew that Officer Casado's failure to secure the panel was a violation of DACDC policy because she was trained (who trained her she does not say) to lock the panel before leaving it. And of course, any reasonable person would realize it is unsafe to leave a control panel unlocked in a juvenile detention center at any point—much less after violent threats have been made.

But what is missing from the calculus is evidence that these junior officers were aware of facts from which the inference could be drawn, and also drew the inference, that leaving the control panel unlocked posed a serious risk of harm to A.L. *See id.* at 837–38. Nothing suggests, for example, that either of these corrections officers were aware of the past incidents at the DACDC where detainees accessed the unsecured control panel and opened the cell doors to attack other detainees. Although Officer Casado and Cadet Platero indisputably acted negligently—and, in my view, with gross negligence—their nonfeasance ultimately falls short of deliberate indifference.

The same cannot be said for Sergeant Luna, however. Based on the conflicting record evidence, a jury could infer that Sergeant Luna was aware the control panel was unlocked at the time of the attack on A.L because it was routinely unlocked. Such an inference arises from (1) Defendant Casado's statements (in direct conflict with Sergeant's

16

Luna's statements) that he believed nobody on his shift ever logged off the control panel in the juvenile pod and he had never been trained or directed to do so; (2) Defendant Platero's statement that she witnessed Casado move away from the control panel without locking it just prior to the attack but said or did nothing; (3) the "pervasive" factual dispute, as recognized by the district court, surrounding DACDC control panel protocol or lack thereof; and (4) A.H.'s decision to access the panel the morning of the attack.

A reasonable jury could further infer that, as a DACDC sergeant with supervisory responsibilities and direct knowledge of one prior incident, Luna was aware of past problems surrounding operation of the control panel in the juvenile pod. On two previous occasions within the past eighteen months, juvenile detainees accessed an unlocked control panel in order to precipitate attacks on other detainees—the same unfortunate scenario we face here. Notably, the second of these two incidents prompted DACDC officials to disable the control panel in the juvenile pod for an unspecified time period. Sergeant Luna must have known that the control panel in the juvenile pod was disabled for a time precisely because of these attacks given his supervisory position at the DACDC. Moreover, Sergeant Luna was the supervising officer in the juvenile pod on a subsequent occasion when a detainee approached the control panel and, as a result, was placed on pre-disc.

The past incidents involving the control panel at the DACDC cannot be dismissed as too remote from and dissimilar to the facts presented here to bear on Sergeant Luna's state of mind. It is true that the first incident involved two detainees outside their cells, whereas A.H. was the sole detainee permitted in the dayroom at the time of the attack on A.L. But this begs the question: How many juvenile detainees does it take to access an

17

unsecured control panel and push a button or two?  If past incidents at the DACDC are any indication, two may be better, but one is enough.

Indeed, the January 20, 2015 incident involved a single detainee who accessed the control panel, opened another detainee's cell, and then proceeded to assault his fellow detainee in the latter's cell.  Because the record does not provide any additional details, Chief Judge Tymkovich attempts to discount this incident by summarily "conclud[ing] the same logic that undermines the applicability of the previous incident to the assault on A.L. applies to this incident."  Concurring Op. at 10 (Tymkovich, C.J.).  Properly viewing the evidence in the light most favorable to Plaintiff, however, leads to the opposite conclusion—that is, the similarities between this incident and the incident at issue are substantial.  *See McCoy*, 887 F.3d at 1044–45 (explaining we must consider the facts and all inferences in the light most favorable to the party asserting the injury).

Last, but not least, don't forget about Sergeant Luna's particular knowledge regarding A.H.'s violent propensities.  Recall that Sergeant Luna specifically was aware, as illustrated by the DACDC caseworker's April 25 notes, that A.H. was especially dangerous and could not be trusted outside his cell.  Yet, rather than keep an eye on A.H. while he roamed free in the dayroom, Sergeant Luna decided to watch TV.  Based on Sergeant Luna's delayed reaction after A.H. accessed the control panel, there must've been a good show on that morning.

As John Adams once reminded us: "Facts are stubborn things; and whatever may be our wishes, inclinations, or the dictates of our passions, they cannot alter the state of the facts and evidence."  John Bartlett, *Familiar Quotations* 380 (15th ed. 1980).  Given

18

Sergeant Luna's knowledge of past incidents involving the control panel and the particular risk A.H. posed outside his cell—combined with all the other material facts in the record—Luna's mental state at the time of the attack is within the province of a jury, not this Court. For these reasons, I would conclude Plaintiff has carried her burden of demonstrating Sergeant Luna was deliberately indifferent to A.L.'s safety and violated his constitutional right to protection from violence.

B.

This brings me to the second part of our qualified-immunity analysis. My colleagues conclude that Sergeant Luna is entitled to qualified immunity even if he violated the Constitution because A.L.'s asserted constitutional right was not clearly established at the time of the violation. Respectfully, I remain unpersuaded.

1.

Whether Sergeant Luna may be held liable for his wrongdoing at this point turns on the "objective legal reasonableness" of his conduct assessed in light of (1) the factual context of this case and (2) the legal rules that were "clearly established" at the time of the attack. *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) (facts); *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (rules). Sergeant Luna has nothing to worry about if his "actions could reasonably have been thought consistent with the [rules] [he] [is] alleged to have violated." *Anderson*, 483 U.S. at 638.

In every case, we first look for a Supreme Court or Tenth Circuit decision on point to determine whether the legal rule under which a plaintiff seeks to hold a defendant liable is clearly established. *Cordova v. Aragon*, 569 F.3d 1183, 1192 (10th Cir. 2009). Absent

19

any such decision, we consider whether the clearly established weight of authority from our sister circuits holds the rule to be as the plaintiff maintains. *Id.* Neither the Supreme Court nor this Court, however, has ever required "the very action in question" to have "previously been held unlawful." *Anderson*, 483 U.S. at 640; *Halley v. Huckaby*, 902 F.3d 1136, 1149 (10th Cir. 2018) ("[A] prior case need not be exactly parallel to the conduct here for the officials to have been on notice of clearly established law."). Instead, "in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640.

To be sure, prior decisions involving similar facts provide strong support for a conclusion that the law was clearly established. This is why, in most cases, "like" decisions are necessary before we reach such a conclusion. They are not necessary in every case, however, because the Supreme Court has told us that "general statements of the law are not inherently incapable of giving fair and clear warning" to reasonable persons. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)).

*Hope* recognized that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has not previously been held unlawful.'" *Id.* (quoting *Lanier*, 520 U.S. at 271). Such recognition was possible because, in *Hope*, the Court "shifted the qualified immunity analysis from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional." *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004) (McConnell, J.).

20

Accordingly, qualified immunity should not be granted "if government defendants fail to make reasonable application of the prevailing law to their circumstances." *Id.* (internal quotations omitted).

While "like cases" undoubtedly bear upon "fair notice," the relevant standard in ascertaining "clearly established law" is the latter, not the former. The qualified-immunity standard simply does not call for a "single level of [rule] specificity sufficient in every instance." *Hope*, 536 U.S. at 740 (quoting *Lanier*, 520 U.S. at 271); *see also Cordova*, 569 F.3d at 1192. Rather, the precedent on which a court relies to conclude the law was clearly established need only "be *clear enough* that every *reasonable* official would interpret it to establish the particular rule the plaintiff seeks to apply." *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (emphasis added).

Throughout the development of the "clearly established law" standard, the Supreme Court has stressed that the specificity of the rule is especially important in Fourth Amendment cases. *See, e.g.*, *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curiam) (excessive force); *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam) (same); *Wesby*, 138 S. Ct. at 590 (unlawful arrest); *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (excessive force). The concerns associated with defining clearly established law "at a high level of generality" is most salient in the Fourth Amendment context due to the imprecise nature of the relevant legal standards and how such standards apply in rapidly evolving circumstances. *Mullenix*, 136 S. Ct. at 308; *see also Wesby*, 138 S. Ct. at 590. This is particularly true in excessive force cases because "officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and

21

rapidly evolving—about the amount of force that is necessary in a particular situation." *Kisela*, 138 S. Ct. at 1152 (citation omitted).

Because every § 1983 case does not sit at one end of a spectrum or the other, we have recognized, based on what the Supreme Court has told us, that the degree of specificity required from prior caselaw depends on the character of the challenged conduct. *Pierce*, 359 F.3d at 1298. Thus, in *Browder v. City of Albuquerque*, we explained that "[i]n deciding the 'clearly established law' question, [the Tenth Circuit] employs a 'sliding scale' under which 'the more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.'" 787 F.3d 1076, 1082 (10th Cir. 2015) (Gorsuch, J.) (quoting *Shroff v. Spellman*, 604 F.3d 1179, 1189–90 (10th Cir. 2010)).

My colleagues' reservations about our sliding-scale approach comes as no surprise given the Supreme Court's recent qualified-immunity decisions. The Court's slew of per curiam reversals in the past five years—nearly all of which concern the use of excessive force—appears to have most circuit courts tiptoeing around qualified immunity's clearly established prong. But as Judge Carson recognizes: "With no case overruling it, the sliding-scale approach lives in this Circuit." Concurring Op. at 2 (Carson, J.). Until either this Court or the Supreme Court sounds the death knell for our sliding-scale approach, we are bound to apply it rather than merely pay lip service to it.[4]

---

[4] In *Lowe v. Raemisch*, 864 F.3d 1205, 1211 n.10 (10th Cir. 2017), we questioned whether our sliding-scale approach conflicted with Supreme Court precedent post *Hope*. "The *possibility* of a conflict arises because the sliding-scale approach may allow us to find a clearly established right even when a precedent is neither on point nor obviously

22

2.

With this understanding of the applicable standard in mind, let's consider whether Sergeant Luna is entitled to qualified immunity. Four decades ago, this Court held that the Constitution imposes a duty on corrections officers to take reasonable measures to protect inmates under their charge from violence at the hands of other inmates. *Ramos v. Lamm*, 639 F.2d 559, 572–74 (10th Cir. 1980). Then in *Farmer*, decided in 1994, the Supreme Court clarified the contours of this rule, holding that a breach of this duty violates the Constitution where a corrections officer "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." 511 U.S. at 847.

No one can reasonably dispute post *Farmer* and its progeny that once Sergeant Luna learned of the substantial risk of harm to A.L from the assailants' threats and subjectively perceived such threats, he had a duty to take reasonable measures to protect A.L. Thus, the rule under which Plaintiff seeks to hold Sergeant Luna liable is just this: When a detention center officer knows a detainee faces a substantial risk of serious harm from

applicable." *Id.* (emphasis added) (citing *Aldaba v. Pickens*, 844 F.3d 870, 874 n.1 (10th Cir. 2016)). But this brings us back to the point we made in *Pierce*: Should the second prong of qualified-immunity analysis turn solely on the results of a "scavenger hunt" for prior cases with the same facts, or should it focus on the "*more relevant inquiry*" of whether the law put *reasonable* officials on *fair notice* that the described conduct was unconstitutional? 359 F.3d at 1298 (emphasis added). The majority apparently thinks the former. Only the Supreme Court, however, can definitively resolve this question. And as *Lowe* recognized, so far its precedents send us mixed signals. But one thing is certain: The Supreme Court has neither directly commented upon nor overruled our sliding-scale approach. The "possibility of a conflict" is simply not enough to conclude such an approach is no longer the law in this circuit.

another detainee yet fails to employ reasonable available measures to lessen the risk, the officer breaches his or her constitutional duty to protect the vulnerable detainee.

But the fact a constitutional duty to protect arises in the face of an officer's knowledge does not mean it is *necessarily* clear in every case, or even most cases, what reasonable measures consist of or, in other words, what such duty to protect specifically requires of the officer. *See, e.g.*, *Cox v. Glanz*, 800 F.3d 1231, 1247 (10th Cir. 2015) (holding an inmate's right to proper suicide screening procedures during booking was not clearly established). The salient question here is whether this rule was sufficiently specific *in the factual context of this case* to give Sergeant Luna fair warning that his failure to secure the control panel could give rise to constitutional liability. *Mullenix*, 136 S. Ct. at 308 (explaining courts must undertake the clearly established inquiry in light of the specific context of the case).

Here, viewing the facts in the light most favorable to Plaintiff, Sergeant Luna was aware: (1) J.V., J.S., and A.H. had been placed on pre-disc for collectively threatening A.L. less than twelve hours earlier; (2) the three assailants were generally unruly and willing to fight; (3) the three assailants were to be kept away from one another and from A.L. until further notice; (4) the three assailants would be allowed outside their cells daily but only with restrictions; (5) A.H. was outside his cell and in the dayroom just prior to the attack; (6) A.H. could not be trusted outside his cell; (7) the control panel securing the cells had been left unlocked; and (8) two incidents occurred in the juvenile pod in the past eighteen months where, to precipitate an attack, one detainee opened the cell door of another detainee from the unsecured control panel. *See Tolan v. Cotton*, 572 U.S. 650, 657 (2014)

24

(stressing need to view facts and draw inferences in favor of the nonmovant when deciding the clearly established prong). What Sergeant Luna effectively contests is whether a reasonable corrections officer under these circumstances would have understood the state of the law on the morning of the attack required him to ensure the control panel was locked.

The constitutional question here is beyond "beyond debate." *Wesby*, 138 S. Ct. at 589. Mindful that qualified immunity does not protect "the plainly incompetent," *Kisela*, 138 S. Ct. at 1152, the unlawfulness of Sergeant Luna's conduct in failing to secure the control panel follows immediately from the rule that corrections officers must employ reasonable measures to mitigate a known risk of serious harm to a threatened detainee.[5] "After all, some things are so obviously unlawful that they don't require detailed explanation . . . ." *Browder*, 787 F.3d at 1082.

The clearly established standard for determining whether an official has violated a detainee's right to reasonable protection from a known risk of serious harm "is not extremely abstract or imprecise under the facts alleged here, but rather is relatively straightforward and not difficult to apply." *A.N. ex rel. Ponder v. Syling*, 928 F.3d 1191,

---

[5] The circuit court case closest factually to the one at bar may be *Erickson v. Holloway*, 77 F.3d 1078 (8th Cir. 1996). There, the defendant jail guard left the dayroom control panel unattended for about six minutes to make a routine check of the cell block. *Id.* at 1080. Contrary to jail policy, the defendant had not disabled the control panel to prevent inmates from operating the locks. *Id.* While the defendant was away, an inmate opened the electronic lock to the recreation area allowing the assailant to access and beat the plaintiff. *Id.* Nearly two decades later, the Eighth Circuit, citing cases from the Third, Seventh, Eighth, and Eleventh Circuits, commented that "prison officials have an obligation, in a variety of circumstances, to protect non-violent inmates from violent inmates *by keeping cell doors locked*." *Walton v. Dawson*, 752 F.3d 1109, 1121 (8th Cir. 2014) (emphasis added).

1198–99 (10th Cir. 2019); *see also Pauly*, 137 S. Ct. at 552 (explaining the requirement that clearly established law be "particularized to the facts of the case" is intended to shield officers from liability based on alleged violations of "extremely abstract rights").  Put differently, this rule is sufficiently specific to have put Sergeant Luna on notice that his failure to ensure the control panel was secure violated A.L.'s constitutional right to protection from violence at the hands of J.V., J.S., and A.H.  Because any reasonable corrections officer in Sergeant Luna's position would have known his conduct violated A.L.'s asserted right, Luna should not be entitled to qualified immunity.

### III.

Finally, I turn to Defendant DACDC's "municipal" liability.  Plaintiff focuses her constitutional claim of municipal liability on a failure-to-train theory. To prevail against the DACDC under this theory, Plaintiff must show (1) a municipal employee committed a constitutional violation against A.L. and (2) a DACDC policy or custom was the moving force behind such violation.  *Cordova*, 569 F.3d at 1193.  As noted above, a jury could conclude that Sergeant Luna violated A.L.'s Fourteenth Amendment right to substantive due process.  The question that remains, then, is whether a DACDC policy or custom was the moving force behind the underlying constitutional violation.

### A.

In *City of Canton v. Harris*, the Supreme Court held § 1983 permitted a factfinder to hold a municipality liable for its failure to train employees.  489 U.S. 378, 380 (1989).  The "critical question" before the Court was: "Under what circumstances can inadequate training be found to be a 'policy' that is actionable under § 1983?"  *Id.* at 383.  Identifying

26

conduct, or lack thereof, properly attributable to the DACDC is hardly enough to impose municipal liability on it. "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a . . . 'policy or custom' that is actionable under § 1983." *Id.* at 389. When, like here, a plaintiff does not claim the municipality has directly inflicted a constitutional injury, as in the case of a facially unconstitutional policy, but has caused an employee to do so, "rigorous standards of culpability and causation must be applied" to ensure the municipality is not held vicariously liable for its employees' actions."[6] *Bd. Of Cty. Commr's v. Brown*, 520 U.S. 397, 405 (1997).

To establish a municipality's deliberate indifference under a failure-to-train theory, a plaintiff usually must show a "pattern of tortious conduct." *Bryson v. City of Oklahoma City*, 627 F.3d 784, 789 (2010). Decisionmakers' "continued adherence to an approach they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." *Brown*, 520 U.S. at 407. In

---

[6] Based on the record—in particular Sergeant Luna's admission of supervisory authority in his personal affidavit and the failure of the DACDC to make any effort to rebut the same—Sergeant Luna was responsible for the operation of an unwritten discretionary policy in the juvenile pod regarding the securing of the control panel. Thus, at the time of the attack, Sergeant Luna possessed authority to establish municipal policy in the juvenile pod over use of the control panel. In *Pembaur v. City of Cincinnati*, the Supreme Court recognized that if a county board delegates its power to establish final policy to a delegatee, the delegatee's decisions would represent county policy and could give rise to municipal liability. 475 U.S. 469, 483 n.12 (1986). Notably, however, Plaintiff does not seek to hold the DACDC liable based on the theory that Sergeant Luna's alleged wrongdoing was the DACDC's wrongdoing.

addition, such a pattern "may tend to show that the lack of proper training, rather than a one-time negligent administration of the program or factors peculiar to the officer involved in a particular incident, is the 'moving force' behind the plaintiff's injury." *Id.* at 408.

In *Canton*, however, the Supreme Court acknowledged "the possibility that evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." *Brown*, 520 U.S. at 1391; *accord Canton*, 489 U.S. at 390 & n.10. Violent encounters between detainees "may be a highly predictable or plainly obvious consequence" of the DACDC's failure to train its officials on the fundamentals necessary to address recurring situations like threats of violence or more specifically how, in the presence of such threats, to secure the control panel when not in use. *Bryson*, 627 F.3d at 789; *cf. Canton*, 489 U.S. at 396–97 (O'Connor, J., concurring in part) (recognizing a claim that officers were inadequately trained in diagnosing mental illness fell short of the kind of "obvious" need for training sufficient to show deliberate indifference). But we need not ask whether the attack on A.L., considered in a vacuum, is sufficient to sustain municipal liability. Here, we most certainly have a pattern of detainees improperly accessing the control panel in the juvenile pod sufficient to have placed the DACDC on notice that, sooner or later, its purported failure to train was "substantially certain to result in a constitutional violation." *Bryson*, 627 F.3d at 789.

The district court concluded Plaintiff failed to establish a pattern of tortious conduct surrounding the control panel and therefore DACDC officials would not have understood their failure to train officers on appropriate control panel protocol was substantially certain

28

to result in a constitutional violation. Nonsense. Detainees on four separate occasions within eighteen months of the attack on A.L. inappropriately accessed the control panel in the juvenile pod's dayroom. Fortunately, on the first and fourth occasions no harm resulted. Nonetheless, DACDC officials placed the culprits on pre-disc precisely because they realized such conduct was unacceptable and wrought with peril. On the second and third occasions, neither DACDC officials nor targeted detainees were so fortunate. Rather, targeted detainees were ruthlessly attacked and beaten *because the control panel had been left unlocked*. These four occasions considered in the aggregate were sufficient to place DACDC officials on notice that an unsecured control panel in the juvenile pod may result in problems of constitutional proportions for the DACDC, making the questions of causation and deliberate indifference in this case for the jury.

B.

One final point deserves clarification. Relying on cases from our sister circuits, the district court alternatively concluded that because a failure-to-train claim requires a showing of deliberate indifference on the part of the DACDC, Plaintiff must also show the asserted right was clearly established at the time of the attack. *See Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988 (6th Cir. 2017); *Szabla v. City of Brooklyn Park*, 486 F.3d 385 (8th Cir. 2007) (en banc); *Townes v. City of New York*, 176 F.3d 138, 143 (2d Cir. 1999). Judge Carson accepts this approach. I have my doubts.

To be sure, not all *Monell* claims are created equal. But neither are all failure-to-train theories. As explained above, the Supreme Court has distinguished deliberate-indifference claims based on "a pattern of tortious conduct by inadequately trained

29

employees" from those based on "evidence of a single violation of federal rights." *Brown*, 520 U.S. at 407–09; *Canton*, 489 U.S. at 390 & n.10. *Brown*'s statement regarding an "obvious potential for such a violation" concerned the latter. 520 U.S. at 409; *see also id.* at 402 ("We granted certiorari . . . to decide whether the county was properly held liable for respondent's injuries based on Sheriff Moore's *single decision* to hire Burns." (emphasis added)); *id.* at 415–16 (concluding that "Bryan County is not liable for Sheriff Moore's *isolated decision* to hire Burns without adequate screening" (emphasis added)).

As this Court has explained, "deliberate indifference may be found *absent a pattern of unconstitutional behavior* if a violation of federal rights is a highly predictable or *plainly obvious consequence* of a municipality's action or inaction." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 771 (10th Cir. 2013) (emphasis added; citation and brackets omitted). Conversely, when a deliberate-indifference claim is based on a pattern of tortious conduct by inadequately trained employees, a plaintiff need not also prove the underlying violation was obvious (i.e., clearly established). This is because the pattern of unlawful behavior puts a municipal policymaker on sufficient "notice that its action or failure to act is substantially certain to result in a constitutional violation[.]" *Id.* Thus, a municipality can manifest deliberate indifference even when its employee (i.e., the individual defendant) did not violate clearly established law.

The out-of-circuit authorities Judge Carson cites do not compel a contrary conclusion. In each of these cases, the plaintiff's deliberate-indifference claim was based on evidence of a single violation of federal rights, not a pattern of past tortious conduct by municipal employees. *See, e.g.*, *Szabla*, 486 F.3d at 392–93 ("[T]his was a one-time

30

incident, and there is no evidence of a pattern of constitutional violations making it 'obvious' that additional training or safeguards were necessary."); *see also Arrington-Bey*, 858 F.3d at 990–92; *Townes*, 176 F.3d at 142. Indeed, Judge Colloton recognized this critical distinction in *Szabla*. 486 F.3d at 392–93.

Perhaps requiring the violated right to be clearly established is the proper approach when dealing with deliberate-indifference claims premised on an isolated constitutional violation. On the other hand, maybe not. Consider the following hypothetical, which is based on a recent Eleventh Circuit decision:

A municipal policymaker arms its police officers with firearms because it knows the officers will sometimes need to arrest dangerous individuals. Yet, the municipality fails to train the officers regarding the lawful use of deadly force. During an investigation, an officer shoots a ten-year-old child lying on the ground within arm's reach of the officer, while repeatedly attempting to shoot a pet dog that wasn't posing any threat. The child's mother sues the officer for excessive force and also brings a *Monell* claim against the municipality for its failure to train the officer. A court holds, as the Eleventh Circuit did, that the officer is entitled to qualified immunity because his actions did not violate any clearly established rights. *See Corbitt v. Vickers*, 929 F.3d 1304, 1323 (11th Cir. 2019) ("Because we find no violation of a clearly established right, we need not reach the other qualified immunity question of whether a constitutional violation occurred in the first place."), *cert. denied*, No. 19-679, 2020 WL 3146693 (U.S. June 15, 2020).

Applying the rule Judge Carson champions today, does this also "spell the end of th[e] *Monell* claim" against the municipality? *See Arrington-Bey*, 858 F.3d at 995. If the

answer is "yes," I fail to see how this deliberate-indifference standard doesn't effectively afford a form of vicarious immunity to municipalities. *Cf. Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 511 (6th Cir. 2012) ("Because Ratcliff did not violate a clearly established right, it follows that his employer, the Franklin County Sheriff's Office, is also entitled to summary judgment."). In my view, these are dangerous waters. *See Owen v. City of Independence*, 445 U.S. 622, 650 (1980) ("[W]e can discern no 'tradition so well ground in history and reason' that would warrant the conclusion that in enacting [§ 1983], the 42nd Congress *sub silentio* extended to municipalities a qualified immunity based on the good faith of their officers.").

Fortunately, we have no occasion in this case to lay down a categorical rule one way or the other because Plaintiff's deliberate-indifference claim against the DACDC is based on a pattern of tortious conduct by inadequately trained employees. Both the Supreme Court and this Court have unequivocally held such evidence may satisfy the deliberate-indifference element of a *Monell* claim. *Brown*, 520 U.S. at 407–08; *Schneider*, 717 F.3d at 771. Because that settles the issue before us, I would leave for another day the question whether a deliberate-indifference claim based on a single violation of federal rights necessarily requires the asserted right to be clearly established.

IV.

For the reasons stated above, I would affirm the district court's decision to grant summary judgment to Defendants Casado and Platero, but I would reverse the judgment with respect to Sergeant Luna and the DACDC and remand for further proceedings.

I respectfully dissent.